AO 106 (Rev. 04/10) Application for a Search ___ ___.ant (USAO CDCA Rev. 01/2013)

ORIGINAL

# UNITED STATES DISTRICT COURT

for the

Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
2648 FEATHERWOOD STREET,
WESTLAKE VILLAGE, CALIFORNIA

)
)
)
)
)
)

Case No. 15 - 1010M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Central _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

FILED
CLERK, U.S. DISTRICT COURT

JUN -2 2015

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 15 USC §§ 78j(b) & 78ff, & 17 CFR § 240.10b-5 (Securities Fraud/Insider Trading); 18 USC § 371 & 2 (Conspiracy/Aiding & Abetting); 18 USC § 1343 (Wire Fraud). | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

John A. Sheehy, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6-2-15

*Judge's signature*

City and state: Los Angeles, California

Hon. Frederick F. Mumm, U.S. Magistrate Judge
*Printed name and title*

AUSA: MONICA E. TAIT

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The entire premises located at 2648 Featherwood Street, Westlake Village, California (the "SUBJECT PREMISES"). The SUBJECT PREMISES is the residence of Steven Fishoff, and is more particularly described as an approximately 4,700 square-foot, single-family home located at 2648 Featherwood Street, Westlake Village, California. The SUBJECT PREMISES, located on the south side of Featherwood Street, is a two-story residence with, among other things, four bedrooms, four-and-a-half bathrooms, and a three-car garage. The SUBJECT PREMISES has a beige stucco façade, a dark-colored ceramic tile roof, and white trim. The two-car garage door faces west, while the single-car garage door faces north. Both garage doors have windows. There is a wrought-iron balcony banister above the two-door garage. On the left side of the house, there is a white gate that leads to the side yard. The front door of the SUBJECT PREMISES is not visible from the street, but appears to be set back between the two garage doors. A cement-like wall surrounds the front of the house. There is a "2648" plaque on a brick pillar on the right side of the house. The driveway is made of brick-colored pavers. There is a mailbox on the street with the number "2648."

## ATTACHMENT B

### I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 15, United States Code, Section 78j(b) and Section 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud/insider trading); Title 18, United States Code, Section 371 and Section 2 (conspiracy and aiding and abetting); and Title 18, United States Code, Section 1343 (wire fraud) (collectively, the "Specified Federal Offenses"), namely:

a. Documents and records relating to the purchase and/or sale of the securities, from June 2010 to June 2014, including stocks and option contracts, relating to any of the following companies: (i) Synutra International, Inc. ("SYUT"); (ii) Telestone Technologies Corp. ("TSTC"); (iii) Puda Coal, Inc. ("PUDA"); (iv) Lannett Co. Inc. ("LCI"); (v) Quantum Fuel Systems Technologies Worldwide, Inc. ("QTWW"); (vi) HyperDynamics Corp. ("HDY"); (vii) Solitario Exploration & Royalty Corp. ("XPL"); (viii) China Metro-Rural Holdings Limited ("CNR"); (ix) Plug Power Inc. ("PLUG"); (x) Synergy Pharmaceuticals Inc. ("SGYP"); (xi) CPI Aerostructures Inc. ("CVU"); (xii) Ascent Solar Technologies, Inc. ("ASTI"); (xiii) Biodel Inc. ("BIOD"); (xiv) AEterna Zentaris, Inc. ("AEZS"); (xv) NeoStem Inc. ("NBS"); (xvi) CytRx Corporation ("CYTR");

(xvii) RedHill Biopharma Ltd. ("RDHL"); (xviii) Lion
Biotechnologies Inc. ("GNBPD"); (xviii) Comstock Mining, Inc. (
"LODE"); (xix) Phosphagenics Limited ("PPGNY"); (xx) Cymer, Inc.
("Cymer"); (xxi) ASML Holding NV ("ASML"); and/or (xxii) Sangamo
BioSciences, Inc. ( "SGMO") (collectively, the "Issuers");

      b.   Documents and records reflecting financial
accounts and transactions, from June 2010 to June 2014, in the
name of (i) Steven Fishoff ("Fishoff"), Ronald Chernin
("Chernin"), Steven Costantin, a/k/a "Steven Constantin"
("Costantin"), Paul Petrello ("Petrello"), Deshan S.K. Govender,
a/k/a "Dhesh Govender," a/k/a "D.S. Govender" ("Govender"),
Winson Tang ("Tang") (collectively, the "Subjects"); and/or (ii)
the Subjects' associated trading entities, namely Featherwood
Capital, Inc. ("Featherwood"), Gold Coast Total Return, Inc.
("Gold Coast"), Seaside Capital, Inc. ("Seaside"), Cedar Lane
Enterprises, Inc. ("Cedar Lane"), Data Complete, Inc. ("Data
Complete"), Brielle Properties, Inc. ("Brielle"), Oceanview
Property Management, LLC ("Oceanview") (collectively, the
"Trading Entities"); and/or (iii) entities utilized by the
Subjects to share the profits resulting from the Specified
Federal Offenses, namely: Riverside Capital Resources, Shore
Resources, Morgan Lane, and Point Pleasant Investments, Inc.,
including but not limited to the following documents and
records:

(i) Bank statements and records, cancelled checks, deposit and withdrawal slips and records, wire transfer records, financial statements, ledgers, journals, cash receipts, cash disbursement journals, loan documents, credit card statements and receipts, receipts of expenses and purchases, bills and receipts for utilities, phone and Internet service, and other documents reflecting the receipt, disbursement, and transfer of funds and other monetary transactions;

(ii) brokerage statements and other documents reflecting the purchase, sale, transfer and ownership of securities; and

(iii) tax documents including federal, state, county, and local income tax returns, together with supporting work papers, memoranda and correspondence including W-2s, W-4s, 1099s, and any filing extension-related documents.

c. Documents and records concerning any confidentially marketed public offering ("CMPO"), private investment in public equity ("PIPE"), or registered direct offering ("RDO") transaction occurring between June 2010 and June 2014;

d. Documents and records concerning any "wall crossing" agreements from June 2010 to June 2014;

e. Documents, records and other information, including but not limited to correspondence, e-mails, text

messages, memoranda, telephone records, diaries and message pads, personal address books, handwritten notes, appointment books, planners and calendars, showing communications, transactions, and relationships between or among any of the Subjects, the Trading Entities, Ashley Rothweiler, Point Pleasant, Morgan Lane, Riverside Capital Resources, and Shore Resources, and the Issuers, including employees, representatives, and others at or affiliated with the Issuers, including but not limited to any investment bank or financial institution marketing any securities offering or corporate transaction involving the Issuers, including Roth Capital Partners, Brean Murray, Carret & Co., Maxim Group LLC, Aegis Capital Corp., William Blair & Company, L.L.C., Burrill Securities;

f.   Documents and records related to payment(s) or gift(s) to any of the Subjects in connection with their participation in the Specified Federal Offenses;

g.   Any communications or records related to the disposition of any trading profits, cash payments, or any other form of income derived from participation in the Specified Federal Offenses; and

h.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

i.     With respect to any digital device used to
facilitate the above-listed violations or containing evidence
falling within the scope of the foregoing categories of items to
be seized:

(i)   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted, such as logs, registry entries,
configuration files, saved usernames and passwords, documents,
browsing history, user profiles, e-mail, e-mail contacts, chat
and instant messaging logs, photographs, and correspondence;

(ii) evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

(iii) evidence of the attachment of other
devices;

(iv) evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

(v)   evidence of the times the device was used;

(vi) passwords, encryption keys, and other access
devices that may be necessary to access the device;

(vii) applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

(viii) records of or information about Internet Protocol addresses used by the device;

(ix) records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives

intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 60 days from the date of execution of the warrant.  If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

(i)   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of

8
Instrumentality Protocol

items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

(ii) The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c. When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

h.    The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

i.    Notwithstanding the above, after the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offenses listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. The special procedures relating to digital devices found in this warrant govern only the search of digital devices

pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, John A. Sheehy, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed for more than seventeen years.  My experience as an FBI agent has included the investigation of cases involving the use of computers and the Internet to commit violations of federal law, including financial crimes.  I have received training and have gained experience in interview and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer-based crimes, computer evidence identification, computer evidence seizure and processing, and various other laws and procedures.  I have personally participated in the execution of search warrants involving the search and seizure of computer and telecommunications equipment. I also have participated in the execution of financial-related search warrants and have examined the personal and business records of numerous individuals and companies.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search 2648 Featherwood Street, Westlake Village, California (the "SUBJECT PREMISES"), which is more particularly described in ATTACHMENT A.

3.    As further described in this affidavit, the FBI is investigating Steven Fishoff ("Fishoff"), the owner of the

Instrumentality Protocol

SUBJECT PREMISES, and others for engaging in insider trading schemes whereby they executed, or caused others to execute, trades in advance of corporate transactions based on material nonpublic information. Based on the information presented in this affidavit, there is probable cause to believe that the items listed in ATTACHMENT B, which constitute evidence of violations of Title 15, United States Code, Section 78j(b) and Section 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (securities fraud/insider trading); Title 18, United States Code, Section 371 and Section 2 (conspiracy and aiding and abetting); and Title 18, United States Code, Section 1343 (wire fraud) (collectively, the "Specified Federal Offenses"), will be found at the SUBJECT PREMISES. ATTACHMENTS A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my training and experience, my review of information and discussions with other law enforcement personnel who have personal knowledge of the investigation, as well as information obtained from other sources, including information obtained from various law enforcement personnel and witnesses, the review of documents and records, including phone toll records and email communications, and information, documents, and phone and trading analyses obtained from the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"). This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all

of my knowledge of or investigation into this matter. Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only. In addition, the events described in this
affidavit occurred on or about the dates provided herein. Where
figures, calculations, dates and times are reported herein, they
are approximate.

### III. PREMISES TO BE SEARCHED

5. The SUBJECT PREMISES is Fishoff's residence and is
more particularly described as an approximately 4,700 square-
foot, single-family home located at 2648 Featherwood Street,
Westlake Village, California. The SUBJECT PREMISES, located on
the south side of Featherwood Street, is a two-story residence
with, among other things, four bedrooms, four-and-a-half
bathrooms, and a three-car garage. The SUBJECT PREMISES has a
beige stucco façade, a dark-colored ceramic tile roof, and white
trim. The two-car garage door faces west, while the single-car
garage door faces north. Both garage doors have windows. There
is a wrought-iron balcony banister above the two-door garage.
On the left side of the house, there is a white gate that leads
to the side yard. The front door of the SUBJECT PREMISES is not
visible from the street, but appears to be set back between the
two garage doors. A cement-like wall surrounds the front of the
house. There is a "2648" plaque on a brick pillar on the right
side of the house. The driveway is made of brick-colored
pavers. There is a mailbox on the street with the number
"2648."

## IV. STATEMENT OF PROBABLE CAUSE

6.      Special Agents of the FBI and the SEC are engaged in
an insider trading investigation in New Jersey, California, and
elsewhere of Fishoff, Ronald Chernin ("Chernin"), Steven
Costantin, a/k/a "Steven Constantin" ("Costantin"), Paul
Petrello ("Petrello"), Deshan S.K. Govender, a/k/a "Dhesh
Govender," a/k/a "D.S. Govender" ("Govender"), Winson Tang
("Tang"), and others known and unknown (collectively, the
"Subjects").

### Overview of the Secondary Offering Insider Trading Scheme

7.      The investigation to date has revealed that there is
probable cause to believe that the Subjects, acting individually
and through their associated trading entities, namely
Featherwood Capital, Inc. ("Featherwood"); Gold Coast Total
Return, Inc. ("Gold Coast"); Seaside Capital, Inc. ("Seaside");
Cedar Lane Enterprises, Inc. ("Cedar Lane"); Data Complete, Inc.
("Data Complete"); Brielle Properties, Inc. ("Brielle");
Oceanview Property Management, LLC ("Oceanview"); and others
(collectively, the "Trading Entities"), engaged in an insider
trading scheme from in or about June 2010 to at least as late as
in or about July 2013, where they netted more than approximately
$3.2 million in illicit profits by short selling[1] stock based on

---

[1] "Short selling" is the sale of stock that an investor has
borrowed from a third party. The investor later "closes out" or
"covers" the short position by returning the stock to the
lender, typically by purchasing the shares on the open market
or, as was sometimes the case here, with shares purchased by the
investor in a secondary offering.  The short seller hopes to
*(footnote cont'd on next page)*

inside information obtained by Fishoff, Chernin, Costantin, and Govender through their solicitations to participate in confidentially marketed secondary stock offerings[2] by publicly traded companies (collectively, the "Subject Offerings").

8. During the course of this secondary offering insider trading scheme, I believe that the coconspirators exhibited the same general pattern of conduct:

a. First, Subjects Fishoff, Chernin, and Costantin – either directly or, later in the scheme, indirectly through Govender – established relationships with certain investment banks (collectively, the "Investment Banks") for the purpose of, among other things, participating in confidentially marketed secondary offerings involving the Investment Banks' client issuers.

b. Second, for each of the Subject Offerings, Subjects Fishoff, Chernin, Costantin, and/or Govender– as representatives of one or more of the Trading Entities – entered into confidentiality or "wall-crossing" agreements whereby these

---

profit from a decline in the stock price between the sale of the borrowed stock and the later purchase of the stock.

[2] In a "secondary" offering, a company whose securities are already publicly traded conducts an offering of additional shares. There are three primary types of confidential secondary offerings: (1) confidentially marketed public offerings ("CMPOs"); (2) private investment in public equities ("PIPE") offerings; and (3) registered direct offerings ("RDOs"). Unlike in PIPE offerings, investors in CMPOs and RDOs receive unrestricted stock, which can be freely transferred and sold in public markets. CMPOs differ from RDOs in that CMPOs are opened up to public investors after the deal is publicly announced, while RDOs are not opened up to public investors. Most of the Subject Offerings involved in the insider trading scheme were CMPOs.

Subjects were brought "over the wall" - that is, they were provided material, nonpublic information concerning the offering ("Inside Information"), such as the name of the issuer and the general timing of the transaction, for the narrow purpose of determining whether to purchase securities in the offering. By the terms of the wall-crossing agreements, which were generally communicated telephonically and confirmed in writing via email, Fishoff, Chernin, Costantin, and Govender agreed, among other things, (i) not to trade the securities of the offering company, which included a bar from short selling the offeror's securities; and (ii) not to disclose the Inside Information to anyone else before the offering was publicly announced.

      c.    Third, the coconspirators breached the confidentiality and trading restrictions of the wall-crossing agreements. In many instances where Fishoff was not personally wall-crossed in an offering, Chernin and Costantin tipped Fishoff telephonically (including by calling Fishoff at the SUBJECT PREMISES' landlines or on his cellular phone) or by email about the offering prior to the public announcement, in breach of the wall-crossing agreement. Even where Fishoff ostensibly was a party to the wall-crossing agreement, through his affiliation with the wall-crossed trading entity, Fishoff himself breached the wall-crossing agreement by executing short sales based on the Inside Information and by divulging the Inside Information to his friend, Petrello, so that Petrello could conduct parallel short sales. There were also instances where Chernin and/or Costantin breached the wall-crossing

agreements by placing short sales themselves before the

offering.  The coconspirators executed the short sales through

one or more of the trading accounts of the Trading Entities or

through other related accounts that they controlled.  The short

sales were often executed through online trading platforms, with

Fishoff executing numerous online trades that returned to one or

more Internet Service Provider ("ISP") accounts subscribed to by

Fishoff at the SUBJECT PREMISES.[3]

     d.  Fourth, after the offering was publicly

announced, the coconspirators often profitably covered their

short sales with the stock purchased in the offering at a

discount or with shares purchased in the market, since the

market price of the stock usually fell upon the public

announcement of the transaction.

     e.  Finally, the coconspirators shared the proceeds

of the insider trading scheme, with Fishoff wiring money to

---

[3] Based on my training and experience and my review of
online resources, including:
http://www.webopedia.com/TERM/I/IP_address.html, I know that an
"Internet Protocol address" ("IP address") refers to the unique
address assigned to every computer or device on the Internet,
the same way that every telephone has a unique telephone number.
Each time an individual accesses the Internet, the computer from
which that individual initiates access is assigned an IP
address.  A central authority provides each Internet Service
Provider ("ISP") a limited block of IP addresses for use by that
ISP's customers or subscribers.  Most ISP's employ "dynamic" IP
addressing, that is, they allocate any unused IP address at the
time of initiation of an Internet session to the customer or
subscriber gaining access to the Internet.  A dynamic IP address
is reserved by an ISP to be shared among a group of computers
over a period of time.  The ISP logs the date, time, and
duration of the Internet session for each IP address and can
identify the user of that IP address for such a session from
these records.

Chernin and Costantin for their services, and Fishoff receiving compensation from Petrello for the tips related to the Subject Offerings that Fishoff provided to him.

## Relevant Individuals and Entities[4]

9.    Fishoff is the co-owner of the SUBJECT PREMISES,[5] which I believe is his primary residence based on information from public records databases and email records obtained during this investigation.    Fishoff also maintains a second residence in Palm Springs, California.    Mail forwarding information obtained from the United States Postal Inspection Service ("USPIS") shows that Fishoff had his mail forwarded from the SUBJECT PREMISES to his Palm Springs residence from on or about October 29, 2014 to on or about May 2, 2015.    Information from USPIS shows that mail addressed to Fishoff is currently being delivered to the SUBJECT PREMISES; however, Fishoff's wife posted a photograph on Facebook appearing to show Fishoff at the Palm Springs residence on or about May 25, 2015.    Law enforcement's surveillance of the SUBJECT PREMISES and the Palm Springs residence is ongoing.

---

[4] My references to corporate officer/control status and addresses in paragraphs 9 through 23 are based on my review of property records from the State of California, law enforcement public records databases such as Accurint, email records obtained via federal search warrants (see footnote 8, infra), and records obtained from investment brokerages at which the Subjects opened trading accounts.

[5] The Grant Deed for the SUBJECT PREMISES dated June 2, 2005, which is recorded in Ventura County, California, shows that the SUBJECT PREMISES is owned by Fishoff and his wife, Susan Lynn Fishoff.

10.  Fishoff is the president and sole owner of the
Featherwood trading entity, which he named after the street on
which the SUBJECT PREMISES is located.  Fishoff also owns,
controls, and/or is legally and financially affiliated with
several of the other Trading Entities, including Gold Coast,
Seaside, Data Complete, and Cedar Lane, through which he
engaged, or directed others to engage, in securities and other
financial transactions.  Prior to in or about 2009, Fishoff was
associated with a day trading firm based in eastern New York
("Day Trading Firm A").  During the time period of the schemes
described in this affidavit, Fishoff held a checking account at
Union Bank.  Records from the Federal Reserve Bank of New York
and Union Bank, which I have reviewed, show that a portion of
Fishoff's short selling profits from the secondary offering
scheme described in this affidavit were wired into his Union
Bank account, and that Petrello also wired short selling
proceeds from the scheme to Fishoff's Union Bank account.

11.  Petrello, a former resident of Brielle, New Jersey
with a second residence in Boca Raton, Florida, relocated full-
time to Boca Raton in or about August 2014.  Petrello is the
president and sole owner of two of the Trading Entities, namely
Brielle and Oceanview.  He is a personal friend and longtime
business associate of Fishoff, based on, among other things,
their communications via Facebook and email.  Petrello, like
Fishoff, was associated with Day Trading Firm A prior to in or
about 2009, and they have vacationed together.

12. Chernin, a resident of Oak Park, California, is a longtime business associate of Fishoff, based on, among other things, their communications via email. Formerly admitted to practice law in California, records indicate that Chernin was disbarred due to his misappropriation of client assets. With respect to the Trading Entities, Chernin is the president of Gold Coast and Cedar Lane, and an officer of Data Complete.

13. Costantin, a resident of Farmingdale, New Jersey, is Fishoff's brother-in-law and a business associate of Chernin, based on, among other things, their communications via email. Costantin is the president of Seaside and vice president and secretary of Cedar Lane. Costantin worked as a pipefitter for approximately twelve years, as noted on his resume, which he attached to an April 15, 2010 email that he sent to an associate. (See footnote 8, infra.) Costantin held a checking account at New York Community Bank ("NYCB") and is listed on the signature card for this account. Records from the Federal Reserve Bank of New York and NYCB, which I have reviewed, show that Fishoff wired a portion of his short selling profits from Featherwood's Union Bank account to Costantin's NYCB account and to the accounts of entities that he controlled named Riverside Capital Resources and Shore Resources, respectively.

14. Starting in or about October 2012, Govender, a resident of New York, New York, was employed as a portfolio manager of Cedar Lane, as indicated on his resume that he attached to an October 2, 2013 email that he sent to an associate. (See footnote 8, infra.)

15. Tang, a resident of Richmond, California, was Vice President of Clinical Research at Sangamo BioSciences, Inc., as indicated on his resume, which is attached to an October 18, 2013 email from Govender to an associate. (See footnote 8, infra.) Based on email records and Tang's statements to the FBI during a consensual interview on or about December 12, 2014 (see infra), Tang was a personal friend of Govender and, until their falling out in or about August 2014, he and Govender had planned to launch a joint business venture together.

16. Featherwood is a California corporation owned by Fishoff and operated from the SUBJECT PREMISES. Featherwood's business address is the address of the SUBJECT PREMISES. Based on brokerage account records obtained by the SEC, Featherwood maintains numerous trade execution accounts (collectively, "Trade Execution Accounts") with various brokers in its own name and in various additional names under which Featherwood does business ("DBAs"). Based on the SEC's analysis of Featherwood's trading records, obtained from brokerages at which Featherwood holds accounts, after the Featherwood DBAs execute securities transactions through the Trade Execution Accounts, typically the trades ultimately settle into, i.e., clear through, one of Featherwood's prime brokerage accounts (collectively, the "Trade Settlement Accounts"), including an account at "Prime Broker A." Featherwood held a business checking account at Union Bank and Fishoff was listed on the signature card. Records from the Federal Reserve Bank of New York and Union Bank, which I have reviewed, show that a portion of profits from, among other

things, Featherwood's short sale trading were wired to checking accounts controlled by Chernin, Costantin, and Petrello, respectively, as described below.

17.  Gold Coast is a California corporation with business addresses at the SUBJECT PREMISES and at a strip mall located near Chernin's residence.  Corporate documents list Chernin as the president of Gold Coast and Fishoff as an officer. Brokerage account opening records show that Gold Coast is one of the Featherwood DBAs and Fishoff identifies himself as its owner in Prime Broker A's account documents.

18.  Seaside is a New York corporation whose business address is Costantin's home address in Farmingdale, New Jersey. Brokerage account opening records show that Seaside is a Featherwood DBA, and corporate documents list Costantin as president.  In addition, Fishoff identifies himself as its owner in Prime Broker A account documents.

19.  Data Complete is a California corporation with a business address in Woodland Hills, California.  Brokerage account opening records show that Data Complete is a Featherwood DBA, and corporate documents list Chernin as an officer. Fishoff identifies himself as its owner in Prime Broker A account documents.

20.  Cedar Lane is a New York corporation whose business address is Chernin's home address in Oak Park, California. Chernin and Costantin are co-owners of Cedar Lane.  Chernin is the president of Cedar Lane and Costantin is the vice president and secretary of the company.  As reflected in Prime Broker A's

account opening documents, Featherwood (through Fishoff) guaranteed Cedar Lane's Trade Settlement Account at Prime Broker A until at least in or about June 2012. Cedar Lane had a business checking account at CitiBank. Chernin and Costantin were listed on the signature card for the checking account. Records from the Federal Reserve Bank of New York and CitiBank, which I have reviewed, show that profits from, among other things, the Subjects' short sale trading were wired into the Cedar Lane checking account.

21. Brielle is a New Jersey corporation apparently named after the New Jersey town that Petrello, its president and sole owner, principally lived in prior to his full-time relocation to Boca Raton, Florida in or about August 2014. Prior to his relocation, Petrello's New Jersey residential address was listed as Brielle's business address on its Trade Settlement Account documents. Brielle also is registered as a foreign for-profit corporation in the State of Florida with a business address in Boca Raton, Florida. Brokerage account records show that Brielle maintains numerous Trade Execution Accounts, either in the name of Brielle or one of Brielle's various DBAs, as well as a single Trade Settlement Account at Prime Broker A. The SEC's analysis of trading records shows that when those DBAs execute securities transactions, the trades ultimately settle into, i.e., clear through, Brielle's prime brokerage account at Prime Broker A. Brokerage account opening documents show that Petrello is an authorized trader on the Brielle account.

22. Oceanview is a New Jersey limited liability company owned by Petrello and registered to his former home address in Brielle, New Jersey. Like Featherwood and Brielle, Oceanview has a Trade Settlement Account at Prime Broker A and Trade Execution Accounts with other brokers in its own name and in the name of numerous DBAs. When those DBAs execute securities transactions, the trades ultimately settle into, i.e., clear through, Oceanview's prime brokerage account at Prime Broker A.

23. Point Pleasant Investments, Inc. ("Point Pleasant") is an entity owned by Petrello that has a business address in Boca Raton, Florida. Point Pleasant had business checking accounts at J.P. Morgan Chase Bank ("Chase") and Petrello had sole signatory authority for these accounts. Records from the Federal Reserve Bank of New York and from Chase, which I have reviewed, show that Petrello wired a portion of his short selling profits from the Point Pleasant Chase accounts to Fishoff's Union Bank accounts held in his name and in the name of Featherwood.

24. The securities sold and/or purchased by the coconspirators in connection with the insider trading scheme are listed on the NASDAQ Stock Market ("NASDAQ") and/or the New York Stock Exchange ("NYSE").

## Relevant Terms[6]

25.   A CMPO allows a public company, i.e., an "issuer," to raise capital from a select group of investors through a two-phase transaction that starts with a confidentially marketed offering and culminates with a public offering.

26.   After the confidential marketing phase is complete, the CMPO is "flipped" into a public offering shortly before pricing.   The offering is usually publicly announced through the filing of selling documents after the market closes for the day, and the offering is priced before the market opens the following day.

27.   A PIPE transaction involves the private sale of unregistered securities at a discount for the purpose of raising capital.   A PIPE, unlike a CMPO, generally is never converted to a public offering.

28.   An RDO is similar to a PIPE, in that they both involve the sale of securities to a select group of investors. Securities sold through an RDO are already registered and therefore may be freely resold in the market following the

---

[6] The definitions contained in this section are drawn from my training and experience, my discussions with SEC attorneys, and my review of pertinent articles such as:  (1) Bloomberg BNA, Securities Regulation & Law Report, "Confidentially Marketed Public Offerings:  Let's Get Technical," available at https://www.cov.com/files/Publication/5d7fade9-6ff8-4cbc-a3cd-9138d3a5403a/Presentation/PublicationAttachment/ad376147-16b3-4721-8733-95f88be87534/Confidentially_Marketed_Public_Offerings_Let_Get_Te chnical.pdf; and (2) Kuhn, Matthew, Zimmerman, Jonathan R., "The Benefits of Confidentially Marketed Public Offerings for Medtech Companies" (April 28, 2011), available at http://www.martindale.com/securities-law/article_Faegre-Benson-LLP_1275564.htm.

offering. In contrast, securities sold via a PIPE are unregistered and are restricted in trading until after the issuer registers the securities.

29. In CMPOs, PIPEs, and RDOs, the issuers market the transactions on a confidential basis prior to public announcement. Specifically, the issuer and its potential investors typically enter into "wall-crossing" agreements whereby the investors are "brought over the wall," i.e., they agree to refrain from disclosing their knowledge of the planned transaction and from trading in the relevant securities until after the transaction takes place. Wall-crossing agreements typically are secured orally by the investment bank(s) marketing these transactions and confirmed in writing via email.

30. CMPOs, PIPEs, and RDOs, though less so, generally price at a discount to the current market price of the securities. Following the public announcement of the transaction, the market price of the issuer's securities usually drops appreciably.

31. Because CMPOs, PIPEs, and, at times, RDOs generally price securities at a discount to their market price, investors can make significant profits by "shorting" the securities prior to the public announcement of the transaction. "Shorting" or "short selling" is the practice of selling securities that have been borrowed from a third party with the intention of buying the securities back at a later date, in order to return them to the lender. The act of buying back the securities that were sold is called "covering the short" or "covering the position."

The short seller hopes to profit from a decline in the price of the securities between the sale and the repurchase.

32. An investor who is privy to material nonpublic information concerning a planned CMPO, PIPE, or RDO may profit by short selling the issuer's securities prior to the public announcement of the offering and covering the short after the transaction is announced. In so doing, short-selling investors may profit by selling their borrowed securities at the higher, pre-announcement market price, and then by covering the short with securities purchased at the post-announcement discounted market price and/or with securities purchased at the discounted CMPO, PIPE, or RDO price.

## Illicit Trading Based on the Offering Companies' Inside Information

### The Synutra Offering
(Announced After Markets Closed on June 24, 2010)

33. Based on all the information I have reviewed in connection with this investigation, I believe the secondary offering insider trading scheme started no later than in or about June 2010, by which time Fishoff and Petrello had left Day Trading Firm A and started trading through their own investment vehicles - namely, Fishoff through Featherwood and its related entities, and Petrello through Brielle, Oceanview, and their related entities.

34. As set forth in the following paragraphs, on or about June 15, 2010, Chernin, on behalf of Gold Coast, was brought over the wall by Roth Capital Partners ("InvBank 1"), the investment bank soliciting investors for a CMPO involving

Synutra International, Inc. (NASDAQ: "SYUT")[7] (the "Synutra
Offering"). As Chernin's business partner in Gold Coast (see ¶
17 supra), Fishoff was equally subject to the disclosure and
trading restrictions set forth in the wall-crossing agreement.

35. I believe, based on phone and email records,[8] and as is
described more fully in the paragraphs below, that shortly after

---

[7] For each of the Subject Offerings, the offering companies'
respective NASDAQ or NYSE ticker symbols are noted in
parentheses.

[8] Throughout this affidavit, my references to "phone
records," "email records," and "phone and email records," and
the fact that particular telephone calls or emails took place
refers to the following: (A) Phone records. I know that during
its investigation, the government obtained subscriber
information and telephone toll records for the following phone
numbers, among others, subscribed to by the following persons:
805-660-9447, subscribed to by the wife of Steven Fishoff and
listed by Steven Fishoff as his cellular telephone in email
records; 805-241-9447, subscribed to by Steve Fishoff; 805-241-
9553, subscribed to by Steve Fishoff; 818-825-9873, subscribed
to by Ron Chernin; 818-825-0342, subscribed to by Ron Chernin;
818-570-9620, which is listed by Ronald Chernin as his phone
number in email records; 818-224-0849, subscribed to by Ron
Chernin; 908-461-3131, subscribed to by Paul Petrello; 732-280-
2515, subscribed to by Point Pleasant, which is associated with
Paul Petrello; 732-292-1550, subscribed to by Point Pleasant,
which is associated with Paul Petrello; 561-997-7370, subscribed
to by Paul Petrello; 732-403-6978, subscribed to by the wife of
Steven Costantin and listed by Steven Costantin as his cellular
telephone in email records; 732-919-0903, subscribed to by
Steven Costantin; 732-665-6385, subscribed to by Steven
Costantin; 917-715-4966, subscribed to by Camillus Country Club,
which is, based on email records, owned by the parents of Deshan
Govender and listed by Govender as his cellular telephone in
email records; and 310-497-7038, which, based on subscriber
information, is billed to Winson Tang's employer, Sangamo
BioSciences, Inc. and used by Winson Tang. My references to
phone records are to some or all of these records; (B) Email
records: In the District of New Jersey, law enforcement
previously applied for, and obtained, court-issued federal
warrants to search the following email accounts: (1) Steven
Fishoff's jfishoff@aol.com email account and Steven Costantin's
cuz126@aol.com email account (Mag. No. 13-7334 (CLW)); (2)
Steven Costantin's steve@seasidecapitalinc.com email account
(Mag. No. 13-7333 (CLW)); (3) Ronald Chernin's

*(footnote cont'd on next page)*

Instrumentality Protocol

being wall-crossed on or about June 15, 2010, Chernin passed the Inside Information related to the planned Synutra Offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff and Petrello then short sold the stock, and made a profit after the public announcement of the offering.

36. Based on phone records and the testimony of InvBank 1 representative A ("InvBank 1 Rep. A") before the SEC, early in the morning on or about June 15, 2010, at approximately 8:57 a.m. PT, Chernin and InvBank 1 Rep. A spoke on the phone for approximately sixteen minutes. Based on my training and experience, my review of InvBank 1's records and information pertaining to its wall-crossing policies and procedures, and InvBank 1 Rep. A's testimony before the SEC, this may be when InvBank 1 Rep. A orally brought Chernin over the wall - that is, provided Inside Information to Chernin pertaining to the Synutra Offering on the condition that neither Chernin nor any other

---

ron@goldcoasttotalreturn.com email account (Mag. No. 13-7332 (CLW)); (4) Ronald Chernin's rhchernin@hotmail.com email account (Mag. No. 13-3084 (JBC)); (5) Deshan Govender's dhesh.healthcare@gmail.com email account (Mag. No. 14-6741 (MAH)); as well as (6) Deshan Govender's dhesh@cedarlaneenterprises.com email account and Steven Costantin's steve@cedarlaneenterprises.com email account (14-6740 (MAH)). My references to email records are to subsets of these records, unless otherwise specifically indicated. In addition, my review of email records contained in Chernin's Hotmail account shows that emails sent to Chernin's UCLA alumni email account ("kdad@uclaalumni.net") were automatically forwarded to his Hotmail account, based on the presence of emails sent to Chernin's UCLA account in his Hotmail account, without an intervening manual forwarding of the email contained in the email chain. I also specifically note below examples of other Subject email accounts that had auto-forwarding settings in place for particular time periods.

representatives of Gold Coast trade in Synutra securities prior to the public announcement of the offering.

37.  Phone records indicate that at approximately 9:14 a.m. PT, just one minute after the conclusion of Chernin's call with the Synutra Offering representative, Chernin called Fishoff. This call lasted only one minute, but phone records show that Chernin placed an approximately four-minute call to Fishoff at 9:38 a.m. PT.  Phone records indicate that, in total, there were more than approximately ten calls between Chernin and Fishoff that day.

38.  According to InvBank 1's records, which I have reviewed, Chernin was formally wall-crossed as of approximately 10:08 a.m. PT, with InvBank 1 representatives' reading of an over-the-wall script to Chernin that provided, in substance and in part:

> The existence of this proposed offering is highly confidential . . . . you do agree to the following: you/your institution will maintain in confidence the existence of this proposed offering . . . will not disclose [it] to third parties . . . [and] [l]astly, neither you, your institution, nor your respective representatives will transact in the securities of the Issuer until such time as the potential offering has been publicly announced or otherwise permitted in accordance with the Master Acknowledgment Agreement?"

Pursuant to InvBank 1's policies and procedures, of which I have become familiar through my review of InvBank 1 records and InvBank 1 Rep. A's testimony to the SEC, Chernin would not have been given any Inside Information relating to the Synutra Offering unless he first verbally provided an express, affirmative answer to the above-referenced question.

39.  Based on phone records, at approximately 10:29 a.m.
PT, Chernin used his cellular telephone to call Costantin's
cellular telephone, with the call lasting for approximately
seven minutes.

40.  Email records show that at approximately 12:50 p.m.
PT, Chernin, via his UCLA alumni email account
("kdad@uclaalumni.net"), received a confirmatory wall-crossing
email from InvBank 1 stating, in substance and in part:

> This is to confirm your conversation with David Henry
> and Tom Palmer on June 15, 2010 in which they
> communicated to you "Confidential Information" . . .
> concerning a proposed transaction by Synutra[,] . . .
> includ[ing] (i) the Issuer's name[;] (ii) the
> existence of a proposed transaction by the Issuer[;] .
> . . [as well as potentially] (iii) the type, amount
> and basic terms of the securities that may be offered
> in the proposed transaction[;] and (iv) the timing and
> general purpose of the proposed transaction and any
> other disclosed information.
>
> The existence of the proposed transaction by Synutra .
> . . is highly confidential.  You have agreed to
> maintain in confidence the Confidential Information .
> . . .  You and any other representatives of [Gold
> Coast] to whom the Confidential Information has been
> disclosed further agreed not to transact in the
> securities of Synutra . . . until the earlier of such
> time as the Master Acknowledgement Agreement ceases to
> apply to the Confidential Information or until such
> time the Confidential Information is publicly
> announced or you receive written notification (in the
> form of an email) by [InvBank 1] of the termination or
> abandonment of the proposed transaction.

41.  Phone records indicate that on or about June 19, 2010,
at approximately 10:57 a.m. PT, Petrello called Fishoff's
cellular telephone and they spoke for approximately nineteen
minutes.  A few days later, on or about June 21, 2010, Fishoff

21
Instrumentality Protocol

used his personal email account ("jfishoff@aol.com") to send an email to Chernin at his business address ("ron@goldcoasttotalreturn.com") that simply had the subject line: "CALL ME ON DEALS."

42. The following day, on or about June 22, 2010, Fishoff started trading in Synutra stock, with Petrello trading in parallel fashion.[9] Using or causing others to use their respective online trading platforms[10], Fishoff short sold

---

[9] Throughout this affidavit, when I refer to stock trading activity, including short sales, purchases to cover, and references to whether the Subjects and/or their associated entities had ever traded before in the subject security, unless otherwise indicated, I base those statements on my review of trading analyses and chronologies obtained from the SEC, which in turn, prepared those analyses and chronologies using trading data from trading blotters and "blue sheets" obtained from the brokers who executed and/or cleared the subject trades. Trade blotters are records of trades and the details of the trades made over a period of time (usually one trading day). The details of a trade will include such things as the time, price, order size and a specification of whether it was a buy or sell order. See Investopedia, "Blotter," available at http://www.investopedia.com/terms/b/blotter.asp. Blue sheets are requests for information sent out by the SEC to market makers, brokers and/or clearinghouses. Blue sheets ask for information related to specific securities or transactions. See Investopedia, "Blue Sheets," available at http://www.investopedia.com/terms/b/bluesheets.asp.

[10] The SEC has provided to the FBI an analysis of online trades conducted by Fishoff, Petrello, Chernin, and Costantin. The analysis provides the usernames and IP addresses utilized by these Subjects or their associates to log on to their respective online trading accounts. Unless otherwise indicated, where this affidavit refers to a particular Subject executing a trade, it refers to a trade being conducted through an online trading account associated with that particular Subject, which account's subscriber information, including the username associated with a particular Subject, was subpoenaed by the SEC from the trading platform entity. Specifically, trades were executed by Fishoff or his associates via the usernames, "JFISHOFF@PACAM," on the Real Tick/PACAM online trading platform, or "JFISHOFF@PRECISIONRET," on the Real Tick/Precision online trading platform; by Chernin or his associates via the username,
(footnote cont'd on next page)

thousands of shares of Synutra stock through Featherwood between
on or about June 22 and June 24, 2010, and Petrello likewise
short sold thousands of shares of Synutra stock between on or
about June 23 and June 24, 2010, with their short selling ending
on the last trading day before the public announcement of the
offering.  Neither Fishoff nor Petrello had ever traded in
Synutra stock prior to this time period.

43.  The Synutra Offering was publicly announced shortly
after the market closed on or about June 24, 2010 and the
pricing of the deal was announced not long before the market
opened the following day, on or about June 25, 2010.  Synutra
priced the offering at a discount of approximately 8.87% from
the prior day's closing, and the market price of Synutra stock

"p-dupasquier20," on the Neovest online trading platform; by
Petrello or his associates via the username, "p-dupasquier1," on
the Neovest online trading platform; and by Costantin or his
associates via the username, "SCOSTANTIN@PRECISIONRET," on the
Real Tick/Precision online trading platform.  For the Synutra,
Telestone, Puda Coal, and Lannett Offerings, the ISPs no longer
retained the subscriber information for the IP addresses
utilized to execute trades in those issuers' securities, as the
retention period for such information had lapsed by the time the
SEC subpoenaed said information.  For many of the later
offerings, namely the Quantum Offering, the Solitario Offering,
the China Metro Offering, the Plug 1 Offering, the Plug 2
Offering, the Synergy Offering, the CPI Offering, the Ampio
Offering, as well as for the Cymer acquisition, the SEC
obtained, via administrative subpoena, subscriber information
for the first trade executed by the Subjects during the trading
periods referenced in this affidavit, which information was
available as it was within the ISPs' retention period.  For the
Biodel, AEZS, and Sangamo transactions, the SEC did not obtain
the subscriber information for the IP addresses associated with
the online trades executed in those securities.  Bluesheet data,
however, shows that entities associated with the Subjects traded
in those securities during the time periods referenced in this
affidavit after one or more of the Subjects received Inside
Information related to the issuer.

decreased approximately 12.7% from the prior day's closing price.

44. Fishoff, via Featherwood, covered his short position soon after the public announcement of the Synutra Offering, making a profit of approximately $57,832 after Chernin/Gold Coast obtained Inside Information. Fishoff split these profits with Chernin, as reflected by a Featherwood "Profit Details Report" that Fishoff, using his personal email address, emailed to Chernin's business address on or about July 2, 2010, with the subject line, "PLEASE LOOK OVER AND ADVISE[.]" The Report reflects their short sales of Synutra stock on or about June 22 and June 24, 2010, prior to the public announcement of the offering, and therefore in breach of the wall-crossing agreement. The Report also has columns for "Profit Date," "Gross Profit," and "Net Profit," as well as a "Profit Total" row for the trades in Syuntra stock and other securities for June 2010.

45. Petrello, via Brielle, also profited from short selling Synutra stock prior to the offering announcement, making a profit of approximately $25,168.

## *The Telestone Offering*
### *(Announced Before Markets Opened on November 24, 2010)*

46. As set forth in the following paragraphs, on or about November 17, 2010, Chernin, on behalf of Gold Coast, was brought over the wall by InvBank 1, which was soliciting investors for a CMPO involving Telestone Technologies Corp. (NASDAQ: "TSTC") (the "Telestone Offering"). As Chernin's business partner in

Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

47.  I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about November 17, 2010, Chernin passed the Inside Information related to the planned Telestone Offering to Fishoff, who in turn relayed the Inside Information to Petrello.  Both Fishoff and Petrello then short sold the stock, and made a profit after the public announcement of the offering.

48.  On or about November 17, 2010, at approximately 1:42 p.m. PT, Chernin called InvBank 1 Rep. A's office number[11], and the call lasted for approximately six minutes.  Immediately after this call ended, Chernin used his cellular telephone to call Fishoff's cellular telephone and they spoke for approximately five minutes.

49.  According to an InvBank 1 over-the-wall attestation form completed at approximately 1:55 p.m. PT, Chernin, on behalf of Gold Coast, was brought over the wall by InvBank 1 and agreed to the associated disclosure and trading restrictions.

50.  At approximately 2:01 p.m. PT, InvBank 1 sent an email to Chernin at his UCLA alumni email account, confirming in substance and in part that:

> [Chernin] ha[d] agreed to maintain in confidence the Confidential Information . . . . [and that Chernin] and any other representatives of [Gold Coast] . . . further agreed not to transact in the securities of Telestone . . . until the earlier of such time as the

---

[11] InvBank 1 Rep. A identified this phone number as his own during his sworn testimony before the SEC.

> Master Acknowledgment Agreement ceases to apply to the
> Confidential Information or until such time the
> Confidential Information is publicly announced or
> [Chernin] receive[d] written notification (in the form
> of an email) by [InvBank 1] of the termination or
> abandonment of the proposed transaction.

51. At approximately 2:18 p.m. PT, Fishoff used his
cellular telephone to call Petrello for approximately one
minute, and then at approximately 2:20 p.m. PT, Petrello called
Fishoff back and they spoke for approximately sixteen minutes.

52. The following day, on or about November 18, 2010, and
continuing through on or about November 23, 2010, Fishoff short
sold thousands of shares of Telestone stock via an online
trading platform, in breach of the wall-crossing agreement.
Petrello, also using an online trading platform, similarly short
sold thousands of shares of Telestone stock during an
overlapping time period, from on or about November 22 to
November 23, 2010, with their short selling ending on the last
trading day before the public announcement of the offering.
Neither Fishoff nor Petrello had ever traded in Telestone stock
prior to this time period.

53. The Telestone Offering was publicly announced just
before markets opened on November 24, 2010. The Offering was
priced at approximately $12 per share, a discount from the prior
day's closing price of approximately $14.13 per share.
Telestone shares opened at approximately $12.36 per share and
closed at approximately $12 per share.

54. Fishoff covered Featherwood's short position on or
about November 24, 2010, making a profit of approximately

$134,106 after Chernin/Gold Coast obtained Inside Information. Fishoff split these profits with Chernin, as reflected by a Featherwood "Profit Details Report" that Fishoff, using his personal email address, emailed to Chernin's UCLA alumni email address on or about December 2, 2010 with the subject line, "please review." The Report, which identifies Telestone by its ticker symbol and refers to the specific number of shares sold and then purchased to cover, the sale and purchase prices, and the resulting profits, reflects that they covered their illegal short sales of Telestone stock with the purchase of approximately 60,000 shares of Telestone stock at approximately $12 per share, and that they split the resulting profits.

55. Petrello, via Brielle, likewise profited from short selling Telestone stock prior to the offering announcement, making a total profit of approximately $21,833.

## The Puda Coal Offering
### (Announced Before Markets Opened on December 8, 2010)

56. As set forth in the following paragraphs, on or about December 1, 2010, Chernin, on behalf of Gold Coast, was wall-crossed by Brean Murray, Carret & Co. ("InvBank 2"), the investment bank soliciting investors for an offering by Puda Coal, Inc. (NYSE: "PUDA") (the "Puda Coal Offering"). Costantin, on behalf of Seaside, likewise was wall-crossed that same day by InvBank 2.

57. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about December 1, 2010, Chernin and

Costantin passed the Inside Information related to the planned
Puda Coal Offering to Fishoff, who in turn relayed the Inside
Information to Petrello. Both Fishoff and Petrello then short
sold the stock, and made a profit after the public announcement
of the offering.

58. On or about December 1, 2010, sometime before 6:24
a.m. PT, Chernin was telephonically wall-crossed by the Managing
Director of Investment Banking at InvBank 2 ("InvBank 2 Rep A").
According to the sworn testimony of InvBank 2 Rep A before the
SEC, based on his custom and practice and InvBank 2's policies
and procedures, InvBank 2 Rep A must have wall-crossed Chernin
shortly before InvBank 2 Rep A sent a 6:24 a.m. PT email to his
colleague, "InvBank 2 Rep B," stating in substance and in part:

> Ron Chernin: Gold Coast
> rhchernin@hotmail.com
> Send PW

59. Around this same time, at approximately 6:23 a.m. PT,
Chernin called Fishoff's cellular telephone and they spoke for
approximately four minutes. Almost immediately after ending his
call with Chernin, Fishoff used his cellular telephone to call
Petrello, with the call lasting approximately fourteen minutes.

60. At approximately 6:31 a.m. PT, Costantin used his
landline phone to call, based on InvBank 2 records, an office
number formerly assigned to "InvBank 2 Rep. C," who had been
Costantin's contact at the investment bank, and then assigned to
"InvBank 2 Rep. D," Senior Vice President of Institutional
Equity Sales. The call lasted for approximately two minutes,

immediately after which Costantin called Chernin's phone.
Costantin and Chernin spoke for approximately eleven minutes.

61. At approximately 6:41 a.m., "InvBank 2 Rep. E," Head
of Capital Markets at InvBank 2, sent an email to InvBank Rep. A
stating, in substance and in part: "This account was previously
handled by [InvBank 2 Rep. C]. [Costantin] called in to
[InvBank 2 Rep. D] today (same phone number as [InvBank 2 Rep.
C]) and said he heard a rumor we were in the market with
something. Wants a call." This email forwards an email from
InvBank 2 Rep. D stating in substance and in part: "Steve
Constantin 732-919-0903," with the subject line: "Seaside
Capital."

62. At approximately 6:44 a.m. PT, based on InvBank 2
records, an InvBank 2 representative called Costantin's landline
number, with the call lasting approximately six-and-a-half
minutes. Almost immediately after this call ended, Costantin
used his landline phone to call one of Fishoff's landlines, and
they spoke for approximately three minutes. After ending his
call with Fishoff, Costantin tried[12] calling Chernin.

63. At approximately 7:04 a.m., InvBank 2 Rep. A sent an
email to Costantin at his Seaside email address
("steve@seasidecapitalinc.com"), stating in substance and in
part:

---

[12] Throughout this affidavit, when I state that someone
"tried" to call someone else, I am referring to the fact that
the telephone toll records indicate that the call lasted no more
than several seconds.

> Hi Steve:
>
> Nice to chat with you; [InvBank 2 Rep. B] will be sending you an OTW [Over the Wall] form and password for NetRoadshow. Please remit with your contact information.

64. At approximately 7:10 a.m., InvBank 2 sent an over-the-wall confirmation email to Chernin at his Hotmail account. The confirmatory email stated, in substance and in part:

> We have discussed and we and representatives of Puda Coal Inc. ("Puda Coal") will discuss with you certain highly confidential information relating to Puda Coal and a potential upcoming offering of securities that may be material/price sensitive. Except as provided immediately below, neither you nor your firm will disclose any of the confidential information regarding Puda Coal or the potential offering we or Puda Coal have provided or will provide (the "Confidential Information") to anyone within or outside your firm (other than, subject to these restrictions, to those people at your firm actively involved in the investment decision with respect to the potential offering) **or engage in market transactions relating to Puda Coal securities or effect any other transaction in such securities until 9:30 am EDT on December 8th, 2010 (by which time such Confidential Information shall have been publicly disclosed or will no longer be material disclosure) or such earlier date as Puda Coal shall have publicly disclosed all of the Confidential Information. . . .**
>
> **We remind you of your obligations under applicable securities laws not to trade on the basis of material non-public information.**

(Emphasis added.)

65. At approximately 7:15 a.m. PT, Chernin used his Hotmail account to send a response email agreeing to the over-the-wall restrictions: "I hereby affirm, on behalf of Gold Coast Total Return and for the benefit of each of Puda Coal

Inc., Macquarie Capital (USA) Inc. and [InvBank 2], Gold Coast
Total Return's agreement to the restrictions stated above."

66. Costantin, at his Seaside email account, also received
an over-the-wall confirmatory email from InvBank 2, at
approximately 7:23 a.m. PT, to which he responded by email at
approximately 7:34 a.m. PT: "I hereby affirm, on behalf of
Seaside Capital,Inc. and for the benefitof [sic] easch [sic] of
Puda Coal Inc. Macquarie Capital, (USA)Inc., and [InvBank 2],
Seaside Capital's agreement to the restrictions stated above."

67. Based on information provided to the Government by the
Legal and Compliance Manager of Bluehost, the Internet Service
Provider for, among other Subjects' accounts, Costantin's
Seaside email account and Chernin's Gold Coast email account,
all emails sent to those accounts were subject to an auto-
forwarding feature. For example, starting at least as early as
in or about October 2010 and continuing through as late as in or
about November 2013, all emails sent to Costantin's Seaside
email address were automatically forwarded to Fishoff's AOL
account and to other Subjects' email accounts. Additionally,
starting at least as early as in or about December 2010 and
continuing through as late as in or about November 2013, all
emails sent to Chernin's Gold Coast email address were
automatically forwarded to Fishoff's AOL account and to
Chernin's Hotmail account. As a result, the over-the-wall
confirmatory email that InvBank 2 sent to Costantin's Seaside
email account on or about December 1, 2010, was automatically
forwarded to Fishoff's AOL account, thus revealing to Fishoff

certain Inside Information contained in the confirmatory email,
including the name of the issuer and the general timing of the
impending offering.

68. On or about Sunday, December 5, 2010 at approximately
8:51 a.m. PT, InvBank 2 Rep. A emailed Chernin at his Hotmail
account, stating in substance and in part: "Hi Ron: Can you
let me know what you are thinking for Puda? We are pricing
Tuesday [December 7] for Wednesday [December 8] (you'll have
free trade pre-open Wednesday). Book is super solid, **pricing .
. . will be quite attractive at a substantial discount from
current levels.** Let me know, I'll do my best to get you what you
indicate." (emphasis added) That same day, Chernin called
Fishoff's cellular telephone at approximately 11:55 a.m. PT for
approximately two minutes, and received a call from Fishoff's
cellular telephone at approximately 12:20 p.m. PT for
approximately five minutes. Chernin and Costantin also spoke by
phone at approximately 2:59 p.m. PT, for approximately six
minutes, and again at approximately 3:08 p.m. PT, for
approximately four minutes.

69. Over the next two days, from on or about December 6 to
December 7, 2010, Fishoff and Petrello each short sold thousands
of shares of Puda Coal stock. Fishoff had never before traded
in Puda Coal stock. Petrello had not traded in Puda Coal
securities for approximately ten months - since in or about
February 2010.

70. On or about December 7, 2010, at approximately 6:21
p.m. PT, Costantin used his AOL account to send an email to

Fishoff's AOL account, with subject line "ADDTL BLOTTER," in which Costantin stated: "SS 10,000 PUDA 14.657." Based on my training and experience, I understand this phrase to mean that Costantin was stating that 10,000 shares of Puda stock had been short sold ("SS") at a price of $14.657. The following day, at approximately 1:27 p.m. PT, Costantin emailed a trade blotter to Fishoff's AOL address that referenced, in substance and in part, the "BUY/COVER" of 10,000 shares of Puda Coal stock at $12 per share.

71. The next day, on or about December 9, 2010, Fishoff emailed one of his traders, Ryan Last Name Unknown ("LNU")[13] at "rainnalen@aim.com," listing a number of securities, including "PUDA," and instructing, "PLEASE FLATTEN." Based on my training and experience, I understand this phrase to mean that Fishoff was directing trader Ryan LNU to cover, i.e., zero out, his position in Puda securities.

72. The Puda Coal Offering was publicly announced on or about December 8, 2010, just before markets opened. Puda Coal shares opened at approximately $12.19 per share and closed at approximately $12.04 per share, representing an approximately 17.3% decline off of the prior day's closing price.

73. Fishoff, via Featherwood, covered his short position soon after the public announcement of the Puda Coal Offering,

---

[13] In the email records, where Fishoff refers to this trader by name, he simply refers to him as "Ryan." There are several emails from Fishoff to Ryan LNU at rainnalen@aim.com in which he directs Ryan to execute various trades, thus indicating that Ryan LNU is one of Fishoff's traders.

making a profit of approximately $323,271 after Chernin/Gold Coast and Costantin/Seaside obtained Inside Information. Petrello, via Brielle, likewise profited from short selling Puda Coal stock after Fishoff had access to the Inside Information, making a total profit of approximately $118,485.

74. Fishoff shared his profits from these and other trades with Chernin and Costantin, as indicated by an email that Chernin sent to Fishoff's AOL account on or about December 26, 2010, with the subject line: "P & L Corrections for December Report." In the body of the email, Chernin stated: "Steve, As you requested, attached are corrections that I found to P & L Report. Thanks," The document attached to Chernin's email states, in substance and in part:

> **TRADES THAT AREN'T SHOWING ON P & L BUT ARE SHOWING ON TRADE ACTIVITY REPORT:**
>
> . . .
>
> 2. Sell 20,000 shares PUDA on 12/7/10 at PCAM for $14.9429
>
> . . .
>
> **TRADES WHERE PORTION OF PROFIT BELONG TO BROTHER-IN-LAW STEVE [COSTANTIN]:**
>
> 1. Steve [Costantin] and I forgot to inform you that Barclays Acct# 291-36448 (Westlake Resources) and Baird Acct# 291-36621 (Gold Coast) should be equally distributed between the two of us. There were 7 trades with these firms that were credited to my account with a net profit of $2163.73. Steve is entitled to ½ of the profit. Sorry for the problem. Whatever is the easiest way for you to disburse the money is great. Thanks.

(Emphasis in original.)

34
Instrumentality Protocol

*The Lannett Offering*
*(Announced After Markets Closed on December 13, 2010)*

75. As described in the following paragraphs, on or about December 13, 2010, Chernin, on behalf of Gold Coast, was wall-crossed by InvBank 1, which was soliciting investors for an offering by Lannett Company, Inc. (NYSE: "LCI") (the "Lannett Offering"). As Chernin's business partner in Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

76. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about December 13, 2010, Chernin passed the Inside Information related to the planned Lannett Offering to Fishoff. Fishoff then short sold the stock, and made a profit after the public announcement of the offering.

77. At approximately 6:38 a.m. PT, Chernin had an approximately 10-minute phone call with an InvBank 1 representative[14]. According to InvBank 1's records, Chernin, on behalf of Gold Coast, was brought over the wall on the Lannett Offering at approximately 6:45 a.m. PT, after Chernin agreed to abide by the over-the-wall disclosure and trading restrictions.

78. At approximately 6:54 a.m. PT, Chernin received a call from Fishoff, apparently calling from Cabo San Lucas, Mexico

---

[14] In this affidavit, where I refer to a call being placed to a representative at an investment bank, I am basing that information on records from the investment bank, the SEC's phone toll records analysis, or on the sworn SEC testimony of investment bank representatives confirming that a particular number is his office number.

based on phone switching records, and then a call from Costantin at approximately 7:02 a.m. PT. Just minutes later, at approximately 7:05 a.m. PT, John Glassman, who, based on email records, is a Fishoff trader, started short selling thousands of shares of Lannett stock through a Featherwood account. Featherwood had never before traded in Lannett securities.

79. Chernin was reminded of the clear terms of the wall-crossing agreement at approximately 1:45 p.m. PT, when he received an email from InvBank 1 at his UCLA alumni email account, confirming, among other things, that Chernin and any other Gold Coast representatives in receipt of Inside Information pertaining to the Lannett Offering had "agreed not to transact in the securities of Lannett" prior to the public announcement or any termination of the offering.

80. The Lannett Offering was announced later that day, December 13, 2010, shortly after markets closed. The offering was priced overnight at approximately $5.00 per share, representing an approximately 14.82% discount off the day's closing price. The next morning, Lannett shares opened at approximately $5.06 per share and closed at approximately $4.93 per share.

81. Fishoff, via Featherwood, covered his short positions shortly after the public announcement of the Lannett Offering, making profits totaling approximately $56,686 after Chernin/Gold Coast obtained Inside Information.

### The Quantum Offering
### (Announced After Markets Closed on February 16, 2011)

82. As described in the following paragraphs, on or about January 31, 2011, Chernin, on behalf of Gold Coast, was wall-crossed by InvBank 1, which was soliciting investors for an offering by Quantum Fuel Systems Technologies Worldwide, Inc. (NASDAQ: "QTWW") (the "Quantum Offering"). As Chernin's business partner in Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

83. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about January 31, 2011, Chernin passed the Inside Information related to the planned offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff and Petrello short sold the stock, and profited after the offering was publicly announced.

84. On or about January 31, 2011 at approximately 11:39 a.m. PT, Chernin used his cellular telephone to call an InvBank 1 representative, with the call lasting approximately eleven minutes. As noted below, Chernin did not receive an over-the-wall confirmatory email from InvBank 1 until on or about February 15, 2011, but that email referred to InvBank 1 previously providing him Inside Information related to the Quantum Offering on or about January 31, 2011.

85. Shortly after his call with the InvBank 1 representative ended, Chernin had an approximately 14-minute

call with Costantin and spoke several more times with Costantin that day. Chernin also had numerous calls with Fishoff, including an approximately three-minute call from Chernin's cellular phone to one of Fishoff's landlines at the SUBJECT PREMISES at approximately 12:54 p.m. PT.

86. The following day, on or about February 1, 2011, Fishoff used his cellular telephone to call Petrello for approximately three minutes. After this call and continuing through February 10, 2011, Fishoff and Petrello exchanged more than forty calls.

87. Between on or about February 10 and on or about February 16, 2011, the last trading day before the public announcement of the offering, Fishoff short sold thousands of shares of Quantum stock, executing the first trade in a series of trades from the SUBJECT PREMISES using an online trading platform.[15] Petrello similarly short sold thousands of shares of Quantum stock during an overlapping time period, between on or about February 11 and on or about February 16, 2011. Neither Fishoff nor Petrello had ever traded in Quantum securities prior to this time period.

_____

[15] As noted supra in footnote 10, the SEC obtained from the ISP, subscriber information for the IP address used by the JFISHOFF@PACAM Real Tick/PACAM account to execute the first in a series of online trades in Quantum securities during this period. I have reviewed an SEC spreadsheet summarizing the ISP records, which shows that IP address 173.55.242.36 was utilized by this Fishoff online trading account to execute a trade on or about February 14, 2011, at approximately 10:11:21 a.m., from the SUBJECT PREMISES.

88. Email records show that on or about February 15, 2011 at approximately 12:25 p.m. PT, InvBank 1 sent an over-the-wall confirmation email to Chernin at his UCLA alumni email address. The confirmatory email stated, in substance and in part:

> This is to confirm your conversation with [InvBank 1 Rep. A] **on January 30, 2011** [emphasis added], in which he communicated to you "Confidential Information" . . . concerning a proposed transaction by Quantum Fuel Systems Technologies Worldwide Inc. Our disclosure included (i) the Issuer's name and (ii) the existence of a proposed transaction by the Issuer. Our disclosure may also include (iii) the type, amount and basic terms of the securities that may be offered in the proposed transaction and (iv) the timing and general purpose of the proposed transaction and any other disclosed information.
>
> The existence of the proposed transaction by Quantum Fuel Systems Technologies Worldwide Inc is highly confidential. You have agreed to maintain in confidence the Confidential Information, and further agreed to use the disclosed information only for the purpose of evaluating the proposed transaction until such time as the Acknowledgement ceases to apply to the Confidential Information. You and any other representatives of your firm to whom the Confidential Information has been disclosed further agreed not to transact in the securities of Quantum Fuel Systems Technologies Worldwide Inc until the earlier of such time as the Master Acknowledgment Agreement ceases to apply to the Confidential Information or until such time the Confidential Information is publicly announced or you receive written notification (in the form of an email) by [InvBank 1] of the termination or abandonment of the proposed transaction.

89. Email records obtained from InvBank 1 show that on or about February 15, 2011 at approximately 12:55 p.m. PT, Costantin, at his Seaside email account, received a virtually identical over-the-wall confirmation email from an InvBank 1 representative stating, in substance and in part, that Costantin

had been brought over the wall that day, on February 15th, and was subject to disclosure and trading restrictions.

90. Email records further show that Chernin had tipped Fishoff about the timing of the Quantum Offering earlier that day, in the morning of February 15, 2011. At approximately 8:33 a.m. PT, InvBank 1 Rep. A sent an email to Chernin at his UCLA alumni email address, copying another InvBank 1 representative. The subject line of the email is "QTWW may come tonight"; and the body of the email states: "Could come tomorrow too. Stay tuned. Final docs will be emailed to you shortly. Tom, I'm traveling so share any detail on QTWW with Ron [Chernin]. He's otw [over the wall]." Chernin forwarded this email concerning the timing of the Quantum Offering to Fishoff at his AOL account at approximately 1:40 p.m. PT.

91. The Quantum Offering was publicly announced the following day, shortly after markets closed on or about February 16, 2011. The offering was priced at approximately $5.07 per share. Quantum shares opened at approximately $5.17 per share and closed at approximately $5.12 per share.

92. Fishoff, via Featherwood, covered his short position soon after the public announcement of the Quantum Offering, making a profit of approximately $105,362 after Chernin/Gold Coast obtained Inside Information. Petrello, via Brielle, gained profits totaling approximately $110,342 from his own short selling of Quantum stock.

93. On or about February 28, 2011, Costantin sent an email with the subject line, "UPDATED DEAL LIST," to Fishoff's AOL

account, stating in substance and in part: "The following deals Ron [Chernin] and I shared . . . 3) Qtwwd, [sic]." Based on the date and context of the email, I believe "Qtwwd" referred to "QTWW," the ticker symbol for Quantum.

## The Solitario Offering
### (Announced After Markets Closed on April 12, 2011)

94. As described in the following paragraphs, on or about March 28, 2011, Chernin, on behalf of Gold Coast, was wall-crossed by InvBank 1, which was soliciting investors for an offering by Solitario Exploration & Royalty Co. (NYSE: "XPL") (the "Solitario Offering"). As Chernin's business partner in Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

95. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about March 28, 2011, Chernin passed the Inside Information related to the planned Solitario Offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff, Chernin, and Petrello short sold the stock, and profited after the offering was publicly announced.

96. On or about March 28, 2011 at approximately 12:29 PT, Chernin had an approximately eight-minute call with an InvBank 1 representative. Immediately after that call ended, Chernin called a Fishoff landline at the SUBJECT PREMISES, with the call lasting approximately two minutes.

97. InvBank 1's records indicate that Chernin was telephonically wall-crossed at approximately 12:38 PT.

According to InvBank 1's attestation form, Chernin agreed, on behalf of Gold Coast, to the over-the-wall disclosure and trading restrictions.

98. At approximately 1:09 p.m. PT and 1:23 p.m. PT, Fishoff used his cellular phone to call Petrello's landline number for approximately four minutes and five minutes, respectively.

99. At approximately 2:14 p.m. PT, InvBank 1 sent an email to Chernin at his UCLA alumni email address confirming, in substance and in part, that "[Chernin] and any other representatives of [Gold Coast] . . . agreed not to transact in the securities of Solitario" prior to the public announcement of the offering.

100. On or about March 29, 2011, at approximately 7:28 p.m. PT, Chernin used his Hotmail account to email Costantin at his AOL account. The email simply has the subject line: "PLS CALL RYAN OR MARIO TOMORROW MORNING TO GET BORROW ON XPL." Based on my training and experience, I understand the phrase, "TO GET BORROW," to mean to borrow stock for short selling purposes; "XPL" is the ticker symbol for Solitario.

101. Between on or about March 28, 2011 and on or about April 12, 2011, Fishoff, Chernin, and Petrello short sold hundreds of thousands of shares of Solitario stock using online trading platforms. Based on IP address records, Fishoff executed the first of his series of trades in Solitario stock

from the SUBJECT PREMISES.[16] Prior to this time period, neither Fishoff, nor Chernin, nor Petrello had ever traded in Solitario securities.

102. After the conclusion of this trading period on or about April 12, 2011, Fishoff sent an email to himself, blind-copying Chernin and possibly others, to which he attached a document referring to, among other things, Solitario on a list of "Pricings for Wednesday, 13 April 2011 – Evening Edition."

103. Chernin confirmed his own trades by emailing "Trade Blotter[s]" to Fishoff and Fishoff's assistant, Ashley Rothweiler ("Rothweiler"). Chernin's Trade Blotters, in which he is identified as "trader7," reflect that Chernin reported to Fishoff, at the very least, the following trades:

| Date/Time (PT) of Email from Chernin to Fishoff and Rothweiler | Transaction |
|---|---|
| 3/28/2011 1:07 p.m. | Chernin's short sale of 3,400 shares of Solitario stock for approximately $3.56 per share. |
| 3/29/2011 1:35 p.m. | Chernin's short sale of 4,000 shares of Solitario stock for approximately $3.58 per share. |
| 3/30/2011 1:08 p.m. | Chernin's short sale of 3,500 shares of Solitario stock for approximately $3.54 per share. |
| 3/31/2011 1:12 p.m. | Chernin's short sale of 1,500 shares of Solitario stock for approximately $3.63 per share. |
| 4/8/2011 1:01 p.m. | Chernin's short sale of 3,600 shares of Solitario stock for approximately $3.46 per share. |
| 4/11/2011 | Chernin's short sale of 4,500 shares of |

[16] The SEC spreadsheet summarizing the ISP records shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about March 29, 2011, at approximately 1:41:51, from the SUBJECT PREMISES.

| Date/Time (PT) of Email from Chernin to Fishoff and Rothweiler | Transaction |
|---|---|
| 1:04 p.m. | Solitario stock for approximately $3.29 per share. |
| 4/12/2011 1:09 p.m. | Chernin's short sale of 5,000 shares of Solitario stock for approximately $2.92 per share. |
| 4/13/2011 8:26 a.m. [after the Offering announcement] | Chernin's purchase, on behalf of Gold Coast, of 175,000 shares of Solitario stock for approximately $2.50 per share. |

104. The Solitario Offering was publicly announced on or about April 12, 2011, just after markets closed. The offering was priced at approximately $2.50 per share. On or about April 13, 2011, Solitario shares opened at approximately $2.74 per share and closed at approximately $2.76 per share, representing an approximately 10% decline from the prior day's closing price and an approximately 21% decline from the April 11 opening.

105. An internal email between InvBank 1 representatives, dated on or about April 12, 2011, at approximately 1:47 PT, states:

> Stephen [sic] Fishoff and Ron Chernin of Gold Coast Total Returns would like to indicate[17] for the XPL transaction. Their interest is as follows:
>
> 350,000 shares at $2.00
> 275,000 shares at $2.25

InvBank 1's records show that in the offering, however, Gold Coast was allocated only approximately 175,000 shares of Solitario stock at approximately $2.50 per share, which is

---

[17] Based on my training and experience, I know that to "indicate" means to formally express an interest to purchase a specific number of shares in an offering.

consistent with Chernin's April 13, 2011 trade blotter, described above.

106. Fishoff and Chernin, via Featherwood, made a profit of approximately $164,516 by short selling Solitario stock prior to the public announcement of the offering, after Chernin/Gold Coast received Inside Information. Petrello, via Brielle, likewise profited from short selling Solitario stock, making a total profit of approximately $172,047.

## The China Metro Offering
### (Announced After Markets Closed on May 5, 2011)

107. On or about March 31, 2011, Costantin, on behalf of Seaside, and on or about April 5, 2011, Chernin, on behalf of Data Complete, were wall-crossed by Maxim Group LLC ("InvBank 3"), the investment bank soliciting investors for an offering by China Metro-Rural Holdings Ltd. (NYSE: "CNR") (the "China Metro Offering").

108. I believed, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed, Costantin and Chernin passed the Inside Information related to the planned China Metro Offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff, Chernin, and Petrello then short sold the stock, and made a profit after the public announcement of the offering.

109. InvBank 3 records show that on or about March 31, 2011 at approximately 12:15 p.m. PT, the Senior Vice President of

Capital Markets at InvBank 3 ("InvBank 3 Rep. A"), emailed a
Compliance associate ("InvBank 3 Rep. B"), writing:

> Brought Steve [Costantin] over the wall on CNR
>
> Steve
> Seaside Capital Inc
> steve@seasidecapitalinc.com

Shortly thereafter, at approximately 12:16 p.m. PT, InvBank 3
Rep. B sent a wall-crossing confirmatory email to Costantin at
his Seaside email address. Due to the account settings for
Costantin's Seaside account, the wall-crossing confirmatory
email was auto-forwarded to Fishoff's AOL account. As a result,
Fishoff would have received the Inside Information set forth in
the confirmatory email, including the name of the issuer
potentially involved in an upcoming offering. Additionally,
Fishoff would have been put on notice of the trading
restrictions set forth in the confirmatory email.

110. Almost immediately upon his receipt of the wall-
crossing confirmatory email, Costantin called a representative
at Du Pasquier[18], one of Featherwood's executing brokers, at
approximately 12:16 p.m. PT. Then Costantin called Chernin at
approximately 12:24 p.m. PT, with the call lasting approximately
three minutes. At approximately 12:34 p.m. PT, Fishoff's online
trading account executed the first of a series of trades in

---

[18] Records obtained by the SEC from Du Pasquier confirm that
this is a Du Pasquier telephone number.

China Metro stock, with this first trade executed from the SUBJECT PREMISES.[19]

111. A few hours later, at approximately 2:07 p.m. PT, Costantin spoke to InvBank 3 Rep. A[20] for approximately five minutes, and then immediately called Fishoff at a landline number located at the SUBJECT PREMISES, with the call lasting approximately four minutes.

112. The next morning, on or about April 1, 2011, at approximately 7:38 a.m. PT, Fishoff used his cellular phone to place an approximately 19-minute call to Petrello. While speaking to Petrello on the phone, Fishoff's online trading account was used to submit an order to sell short approximately 5,000 shares of CNR at no more than $5.50 per share, with approximately 4,329 shares ultimately executed at approximately $5.50 per share. At approximately 7:54 a.m. PT, just minutes after this short sell order was submitted, Brielle – Petrello's entity – placed its first ever trade in CNR, short selling approximately 6,000 shares at approximately $5.17 per share.

113. Chernin also was wall-crossed in this transaction. On or about April 5, 2011, at approximately 9:59 a.m. PT, an InvBank 3 representative ("InvBank 3 Rep. C") emailed Chernin at his Hotmail account, writing: "Ron, I just want to confirm that

---

[19] Specifically, the SEC's spreadsheet shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about March 31, 2011, at 12:34:19, from the SUBJECT PREMISES.

[20] In a Background Questionnaire that InvBank 3 Rep. A completed in connection with his testimony before the SEC, he identified this telephone number as his work phone number.

your account value is $150,000,000.00[.] And that you want to come 'over the wall' on **the deal you asked about**." (emphasis added) Chernin responded, "Confirmed," and then, according to records produced to the Government by InvBank 3, InvBank 3 Rep. C emailed InvBank 3 Rep. B at approximately 10:15 a.m. PT, writing in substance and in part:

> Please bring Ron Chernin over the wall on the CNR deal. I just spoke with him 1:10pm [EST/10:10 a.m. PT] 4/5/11
>
> Ron Chernin
> Data Complete
> ron@goldcoasttotalreturn.com

114. At approximately 10:16 a.m. PT, InvBank 3 Rep. B sent an over-the-wall confirmatory email to Chernin at his Gold Coast email account, copying InvBank 3 Rep. C. Due to the account settings for Chernin's Gold Coast email account, described supra, the over-the-wall confirmatory email was auto-forwarded to Fishoff's AOL account. As a result, Fishoff received an email containing the name of the issuer, i.e., China Metro, involved in the potential offering. He also was put on notice of the wall-crossing agreement's trading restrictions.

115. During this period, starting on or about April 1, 2011, and continuing through on or about May 5, 2011 (the last trading day before the public announcement of the offering), Fishoff, Chernin, and Petrello each short sold thousands of shares of China Metro stock. Fishoff and Chernin's short selling is confirmed by, among other things, a series of trade

blotters that Chernin emailed to Fishoff and his assistant, Rothweiler.

116. The China Metro Offering was publicly announced on or about May 5, 2011, just after markets closed. The offering was priced at approximately $2.88 per share, representing a discount of approximately 15% from the prior closing price. On or about May 6, 2011, China Metro shares opened at approximately $3.32 per share and closed at approximately $2.32 per share, representing an approximately 30% decline off of the prior day's closing price.

117. Fishoff and Chernin, via Featherwood, covered their short positions soon after the public announcement of the China Metro Offering, making a profit of approximately $198,052 after Costantin/Seaside and Chernin/Data Complete received Inside Information. Petrello, via Brielle, likewise profited from short selling China Metro stock, making a total profit of approximately $98,327.

## The Plug 1 Offering
### (Announced After Markets Closed on May 24, 2011)

118. As described in the following paragraphs, on or about May 11, 2011, Costantin, on behalf of Seaside, was wall-crossed by InvBank 1, which was soliciting investors for an offering by Plug Power, Inc. (NASDAQ: "PLUG") (the "Plug 1 Offering").

119. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed, Costantin passed the Inside Information related to the planned Plug 1 Offering to Fishoff and Chernin;

and that Fishoff, in turn, relayed the Inside Information to Petrello. Fishoff, Chernin, and Petrello short sold the stock, and profited after the offering was publicly announced.

120. According to an over-the-wall form completed by a representative of InvBank 1 and produced to the Government, Costantin, on behalf of Seaside, was brought over the wall about the Plug 1 Offering by "InvBank 1 Rep. B," on or about May 11, 2011 at approximately 11:10 a.m. PT. The over-the-wall form states, in substance and in part, that InvBank 1 Rep. B read a script to Costantin that advised him of, among other things, the disclosure and trading restrictions.

121. That same day, Costantin used his landline phone to: (a) call Chernin's cellular telephone at approximately 1:10 p.m., for approximately three minutes; (b) to call one of Fishoff's landlines at the SUBJECT PREMISES at approximately 1:16 p.m., for approximately four minutes; and then (c) to call Chernin again at approximately 1:19 p.m., for approximately four minutes.

122. Then, at approximately 2:33 p.m., Costantin received an over-the-wall confirmatory email from InvBank 1 stating in substance and in part:

> This is to confirm your conversation with [InvBank 1 Rep. B] on May 11, 2011, in which he communicated to you "Confidential Information" . . . concerning a proposed transaction by Plug Power Inc. Our disclosure included (i) the Issuer's name and (ii) the existence of a proposed transaction by the Issuer. Our disclosure may also include (iii) the type, amount and basic terms of the securities that may be offered in the proposed transaction and (iv) the timing and

> general purpose of the proposed transaction and any
> other disclosed information.
>
> The existence of the proposed transaction b Plug Power
> Inc is highly confidential.  You have agreed to
> maintain in confidence the Confidential Information,
> and further agreed to use the disclosed information
> only for the purpose of evaluating the proposed
> transaction until such time as the Acknowledgement
> ceases to apply to the Confidential Information.  You
> and any other representatives of your firm to whom the
> Confidential Information has been disclosed further
> agreed not to transact in the securities of Plug Power
> Inc until the earlier of such time as the Master
> Acknowledgment Agreement ceases to apply to the
> Confidential Information or until such time the
> Confidential Information is publicly announced or you
> receive written notification (in the form of an email)
> by [InvBank 1] of the termination or abandonment of
> the proposed transaction.

123. On the same day as Costantin's May 11, 2011 wall-
crossing, Fishoff received an email from his assistant with the
subject line "Recap 5.11.11."  The email indicates that Fishoff,
via Featherwood, had sold short approximately 25,000 shares of
PLUG stock at an average price of approximately $0.53 per share.
ISP records confirm that at approximately 12:01 p.m. that day,
Fishoff's online trading account executed the first of a series
of trades in PLUG stock, with this first trade executed from the
SUBJECT PREMISES.[21]

124. The following day, Fishoff received another email from
his assistant, with the subject line, "Recap 5.12.11."  This
email indicates that Fishoff had short sold an additional 1,001

---

[21] Specifically, the SEC's spreadsheet shows that IP address
173.55.242.36 was utilized by Fishoff's online trading account
to execute the first trade on or about May 11, 2011, at
approximately 12:01:20, from the SUBJECT PREMISES.

shares of PLUG stock at a price of approximately $0.55 per share.

125. On or about May 17, 2011, at approximately 8:06 a.m. PT, Chernin called Fishoff at one of the landlines located at the SUBJECT PREMISES, and they spoke for more than five minutes. Immediately thereafter, Chernin called Costantin and they spoke for approximately five minutes, until approximately 8:16 a.m. PT.

126. At approximately 8:21 a.m. PT, Chernin sent an email to InvBank 1 Rep. A with only the subject line: "PLS CALL WHEN U HAVE TIME. STEVE WAS ASKING ME ABOUT PLUG. THNX." Then, at approximately 10:18 a.m. PT, InvBank 1 Rep. A called Chernin and they spoke for more than six minutes, until approximately 10:24 a.m. PT. Just minutes later, at approximately 10:30 a.m. PT, Chernin called one of Fishoff's landline phones at the SUBJECT PREMISES, and they spoke for more than four minutes. After speaking with Fishoff, Chernin called Costantin at approximately 10:46 a.m. PT, and they spoke for approximately ten minutes.

127. At approximately 1:03 p.m. PT, Chernin sent an email to Fishoff at his AOL account and to Fishoff's assistant, which attached a trader blotter indicating that Chernin ("trader7") had short sold approximately 11,000 shares of PLUG stock for approximately $0.50 per share. The execution of this trade through a Featherwood account is confirmed by an email from the executing broker to Fishoff and his assistant at approximately 1:51 p.m. PT. That evening, at approximately 6:27 p.m. PT,

Chernin called Costantin and they spoke for approximately ten
minutes.

128. The following day, on or about May 18, 2011, Chernin
emailed another trade blotter to Fishoff and his assistant,
Rothweiler, at approximately 1:02 p.m. PT. This trade blotter
and a confirmatory email from the executing broker at
approximately 1:22 p.m. PT indicated that Chernin, via
Featherwood, short sold an additional 22,000 shares of PLUG
stock that day for approximately $0.50 per share.

129. On or about May 19, 2011, at approximately 8:15 a.m.
PT, an InvBank 1 representative sent an email to Costantin at
his Seaside email account, writing:

> Steve,
>
> Just had an update call . . . . they are going to
> announce this deal and do the reverse split after the
> close tonight, PLUG will trade for 3 days with the new
> stock price of 4 and change. The raise will come next
> week Tuesday 5/24 for Wednesday 5/25.
>
> Still looking at 75% Warrant coverage and **deal should
> be a 15% discount for institutional investors**. This
> news is stirring much more interest in PLUG.

(Emphasis added.) Based on my training and experience, I
understand the email's reference to a stirring of interest in
PLUG to refer to interest among investors solicited to
participate in the offering presumably after being wall-crossed.
Based on the account settings for Costantin's Seaside email
account, this email containing Inside Information related to the
timing and pricing of the Plug 1 Offering was auto-forwarded to
Fishoff's AOL account. The email also was auto-forwarded to

Costantin's own AOL account, which he used to manually forward the email to Chernin's Hotmail account at approximately 8:33 a.m. PT.

130. The following day, on or about May 20, 2011, at approximately 1:38 p.m. PT, Fishoff received an email from his assistant with the subject line, "Recap 5.20.11." The email shows that Fishoff and Chernin, via Featherwood, had sold short a total of approximately 50,722 shares of PLUG stock at an average price of approximately $4.08 per share.

131. Then, on or about May 24, 2011, at approximately 1:42 p.m. PT, Fishoff received an email from his assistant with the subject line, "Recap 5.24.11." The email shows that Fishoff and Chernin had sold short a total of approximately 231,633 shares of PLUG stock at an average price of approximately $4.08 per share.

132. Around this time period, between on or about May 11 and May 24, 2011, Fishoff and Chernin's respective online trading accounts short sold hundreds of thousands of shares of PLUG stock.

133. I believe, based on phone and trading records, that Fishoff tipped Petrello about the Plug 1 Offering. On or about May 13, 2011, at approximately 12:57 p.m. PT, Fishoff used his cellular telephone to call Petrello's cellular telephone for approximately one minute. The next day, on or about May 14, 2011 at approximately 10:22 p.m. PT, Fishoff's cellular telephone called Petrello's cellular telephone again for approximately two minutes. Phone toll records show that that

there were approximately fourteen additional calls between Fishoff and Petrello between on or about May 14 and May 20, 2011.

134. Around this same time period, Petrello short sold hundreds of thousands of shares of PLUG stock, between on or about May 18 and May 24, 2011. Petrello, like Fishoff, had never traded in PLUG securities prior to this time period.

135. The Plug 1 Offering was publicly announced on or about May 24, 2011, just after markets closed. The offering was priced at approximately $2.41 per share. On or about May 25, 2011, Plug opened at approximately $2.39 per share and closed at approximately $2.40 per share, down from the prior day's closing price of approximately $2.85 per share. A May 25, 2011 email that Fishoff and his assistant received from a broker representative indicates that Fishoff, via Featherwood, bought approximately 231,633 shares of PLUG stock at a discounted price of approximately $2.42 per share, thereby profitably covering the short sales, at approximately $4.08 per share, from the day before.

136. In total, Fishoff and Chernin, via Featherwood, made a profit of approximately $190,062 by short selling PLUG stock prior to the public announcement of the offering, after Costantin/Seaside obtained Inside Information. Petrello, via Brielle, likewise profited from short selling PLUG, making a total profit of approximately $238,522.

137. Shortly after the Plug 1 Offering, Fishoff's assistant sent an email to Fishoff on or about June 14, 2011, and blind-

copied Chernin at his Hotmail account and, based on the context of the email, possibly other members of Fishoff's trading team. The email stated:

> Per Steve:
>
> "No on [sic] is allowed to go in for an overnight or spot secondary deals without being given permission. Do not go in for these unless you have spoken to me (Steve)."
>
> Thank you.
>
> Any questions please let me know.
>
> Ash [Rothweiler]

Based on my knowledge, training, and experience, Fishoff was instructing his team of traders not to solicit and/or participate in secondary offerings without first obtaining his permission to do so, thus indicating that he had subsequent conversations with his traders about secondary offerings, which conversations ultimately may have included Inside Information related to those offerings.

## *The Plug 2 Offering*
## *(Announced After the Markets Closed on March 22, 2012)*

138. As described in the following paragraphs, on or about March 9, 2012, Chernin, on behalf of Gold Coast, was wall-crossed by InvBank 1, which was soliciting investors for another planned offering by Plug (the "Plug 2 Offering"). As Chernin's business partner in Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

139. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about March 9, 2012, Chernin passed the Inside Information related to the Plug 2 Offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff, Chernin, and Petrello short sold the stock, and profited after the offering was publicly announced.

140. InvBank 1's over-the-wall confirmation was sent to Chernin at his Gold Coast email account at approximately 9:18 a.m. PT on March 9th. The over-the-wall confirmatory email stated in substance and in part:

> This is to confirm your conversation with ["InvBank 1 Rep. C"] on March 9, 2012, in which he communicated to you "Confidential Information" . . . concerning a proposed transaction by Plug Power Inc. Our disclosure included (i) the Issuer's name and (ii) the existence of a proposed transaction by the Issuer. Our disclosure may also include (iii) the type, amount and basic terms of the securities that may be offered in the proposed transaction and (iv) the timing and general purpose of the proposed transaction and any other disclosed information.
> The existence of the proposed transaction by Plug Power Inc is highly confidential. You have agreed to maintain in confidence the Confidential Information, and further agreed to use the disclosed information only for the purpose of evaluating the proposed transaction until such time as the Acknowledgement ceases to apply to the Confidential Information. You and any other representatives of your firm to whom the Confidential Information has been disclosed further agreed not to transact in the securities of Plug Power Inc until the earlier of such time as the Master Acknowledgment Agreement ceases to apply to the Confidential Information or until such time the Confidential Information is publicly announced or you receive written notification (in the form of an email) by [InvBank 1] of the termination or abandonment of the proposed transaction.

Due to the account settings for Chernin's Gold Coast email account, the over-the-wall confirmatory email was auto-forwarded to Fishoff's AOL account, providing him Inside Information that Plug was planning another offering and putting him on notice of the wall-crossing trading restrictions.

141. Shortly thereafter, on or about March 15, 2012, Fishoff and Petrello spoke by cellular telephone for approximately four minutes.

142. Between on or about March 20 and on or about March 22, 2012, the last trading day before the public announcement of the Plug 2 Offering, Fishoff, Chernin, and Petrello's respective online trading accounts short sold hundreds of thousands of shares of Plug stock, with the first of the series of Fishoff online account trades executed from the SUBJECT PREMISES.[22]

143. The Plug 2 Offering was publicly announced on or about March 22, 2012 just after markets closed. The discounted offering price was approximately $1.15 per share.

144. Fishoff and Chernin, via Cedar Lane, covered their short positions soon after the public announcement of the Plug 2 Offering, making a profit of approximately $102,145 after Chernin/Gold Coast obtained Inside Information. An email from Rothweiler, Fishoff's assistant, to Costantin and Chernin on or about March 30, 2012, indicated that Chernin split his profits

---

[22] The SEC's ISP spreadsheet shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about March 21, 2012 at approximately 10:45:56 a.m., from the SUBJECT PREMISES.

with Costantin. Attached to the email is a Profit Details Report for "Trader, 14," i.e., Costantin, which shows, among other things, the short sale of hundreds of thousands of shares of PLUG stock between on or about March 20 and March 22, 2012, and a total net profit of more than approximately $60,000 for Chernin and Costantin.

145. Petrello, via Brielle, likewise profited from short selling Plug stock, making a total profit of approximately $52,223. Oceanview, an entity owned by Petrello, also short sold Plug stock, making a total profit of approximately $28,683.

## The Synergy Offering
### (Announced After Markets Closed on May 3, 2012)

146. As described in the following paragraphs, on or about April 30, 2012, Fishoff, on behalf of Featherwood, and Chernin, on behalf of Gold Coast, were each wall-crossed by Aegis Capital Corp. ("InvBank 4"), the investment bank soliciting investors for an offering by Synergy Pharmaceuticals, Inc. (NASDAQ: "SGYP") (the "Synergy Offering").

147. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on April 30, 2012, Fishoff passed Inside Information related to the Synergy Offering to Petrello. Fishoff, Chernin, and Petrello short sold the stock, and profited after the offering was publicly announced.

148. On or about April 30, 2012 at approximately 5:59 a.m.,
Chernin called an InvBank 4 representative ("InvBank 4 Rep. A")[23]
and they spoke for approximately six minutes until about 6:05
a.m. PT.  Immediately thereafter, Chernin called Fishoff at one
of the landlines at the SUBJECT PREMISES and they spoke for
approximately four minutes, until approximately 6:09 a.m. PT.
At about the same time, an InvBank 4 representative sent an
email to a colleague stating, in substance and in part:  "Ron
[Chernin] is over the wall as of 9:02 am [EST/6:02 a.m. PT] this
morning."  Chernin then called Costantin at approximately 6:09
a.m. PT, and Costantin called him back at approximately 6:15
a.m. PT.

149. Then, at approximately 6:43 a.m. PT, InvBank 4 Rep. A
sent an over-the-wall confirmatory email to Chernin at his UCLA
alumni email account, confirming that Chernin had agreed to the
wall-crossing trading restrictions.  The over-the-wall
confirmatory email stated, in substance and in part:

> Confidentiality and Non-Disclosure Agreement:
> Synergy Pharmaceuticals, Inc. (Nasdaq:  SGYP)
>
> Pursuant to our telephone conversation and as an
> inducement to obtain confidential investment
> information, this will confirm that you have agreed to
> keep the information to be disclosed/discussed as
> confidential and have agreed not to disclose the
> content of the information to any party not bound by
> our agreement.  Furthermore, you agree not to use the
> information presented in connection with any
> investment outside the nature and scope of the
> proposed investment opportunity.  This agreement shall

_____

[23] I know that this phone number is associated with InvBank
4 Rep. A because he lists it at his phone number in email
records.

> terminate at the earliest of the public release of the
> information disclosed/discussed the report or the
> completion/termination of the proposed offering.

The over-the-wall confirmatory email was followed by an almost
four-minute call between Chernin and InvBank 4 Rep. A at
approximately 6:44 a.m. PT. Chernin, Costantin, and Fishoff
exchanged numerous calls throughout the day.

150. InvBank 4's records, namely a "Confidentially
Contacted List," indicate that Fishoff, on behalf of
Featherwood, was also wall-crossed, at approximately 1:00 p.m.
PT on April 30, 2012. I have not been able to locate a wall-
crossing confirmatory email for Fishoff/Featherwood.

151. I believe, based on phone and trading records, that
Fishoff tipped Petrello about the planned Synergy Offering later
on April 30, 2012. At approximately 9:34 a.m. PT, Petrello
called Fishoff at a landline at the SUBJECT PREMISES, and they
spoke for approximately three minutes. That same day, Petrello,
via Brielle, sold short approximately 10,000 shares of Synergy
stock at approximately $5.95 per share. Petrello had never
before traded in Synergy stock.

152. Additionally, email records indicate that Chernin also
started short selling Synergy stock on April 30th, the very same
day that he was wall-crossed. At approximately 10:01 a.m. PT,
Chernin emailed Rothweiler, Fishoff's assistant, stating in
substance and in part: "The only addition to the blotter
submitted by Steve is **sell short 17,000 SGYP @ 5.9122**."
(emphasis added) Rothweiler responded, "Where was this done?
He did not SS 17k on his RealTick [online trading platform]."

Chernin replied: "Dupasquier. I did it. Cedar Lane[.]" An email at approximately 1:43 p.m. PT from a Du Pasquier broker to Fishoff and his assistant, Rothweiler, with subject line "4/30 TRADE RECAP," confirms this trade, referring to the "Sell Short" of "17,000" shares of "SGYP" at "5.9122" dollars per share by "CEDAR-RON," i.e., by Chernin via Cedar Lane (as he had described to Fishoff's assistant, Rothweiler).

153. Additional Trade Recap emails from Du Pasquier to Fishoff and Rothweiler reveal additional short selling by Chernin, via Cedar Lane, on or about May 1, 2012 (12,000 shares of SGYP at $5.8994 per share), on or about May 2, 2012 (10,000 shares of SGYP at $5.8752 per share), on or about May 3, 2012 (35,040 shares of SGYP at $5.4223 per share), and on or about May 4, 2012 (72,654 shares of SGYP $4.4733 per share).

154. In the midst of Chernin's short selling activity, he received an email at his UCLA alumni email account from InvBank 4, on or about May 3, 2012, that stated, in substance and in part, "We are pricing this transaction tonight for trading tomorrow."

155. Around this time period, between on or about April 30, 2012, and on or about May 3, 2012, Fishoff, via Featherwood, short sold thousands of shares of Synergy stock, with the first trade in the series executed from the SUBJECT PREMISES.[24]

---

[24] The SEC's ISP spreadsheet shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about April 30, 2012, at approximately 11:47:06 a.m., from the SUBJECT PREMISES.

Petrello, via Brielle, also short sold thousands of shares of Synergy stock.

156. The Synergy Offering was publicly announced on or about May 3, 2012, just after markets closed. Synergy shares opened and closed at approximately $4.50 per share, down from the prior day's closing price of approximately $5.69.

157. The next day, Fishoff received an email from a broker that stated, in substance and in part: "We see you have a 75k SGYP trade between yourself and Brielle and Joliene.  However you have sell lot of 150k booked in TMS [trading platform]. Should it be two sells of 75K?"  Fishoff responded, "yes I'll have it changed[.]"  This email correspondence indicates that Fishoff sold approximately 150,000 shares of Synergy stock to Brielle and Joliene (another entity associated with Petrello based on brokerage account opening documents), perhaps to cover Brielle's short sales.

158. Fishoff, Chernin, and Petrello, via their respective trading entities, covered their short positions soon after the public announcement of the Synergy Offering.  Fishoff, via Featherwood, made a profit of approximately $74,951; Chernin, via Cedar Lane, made a profit of approximately $86,475; and Petrello, via Brielle, made a profit of approximately $145,988.

### The CPI Offering
### (Announced After Markets Closed on June 7, 2012)

159. As set forth in the following paragraphs, on or about May 30, 2012, Chernin, on behalf of Gold Coast, was wall-crossed by InvBank 1, which was soliciting investors for an offering by

CPI Aerostructures (NYSE: "CVU") (the "CPI Offering"). As Chernin's business partner in Gold Coast, Fishoff was equally subject to the disclosure and trading restrictions set forth in the wall-crossing agreement.

160. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed on or about May 30, 2012, Chernin passed the Inside Information related to the CPI Offering to Fishoff, who in turn relayed the Inside Information to Petrello. Fishoff, Chernin, and Petrello then short sold the stock, and made a profit after the public announcement of the offering.

161. On or about May 30, 2012 at approximately 10:48 a.m. PT, InvBank 1 Rep. C called Chernin and they spoke for more than two minutes. Immediately after this call, Chernin called Costantin for almost two minutes. Then, at approximately 10:54 a.m. PT, Chernin called Fishoff at one of his landline phones at the SUBJECT PREMISES, and they spoke for more than eight minutes.

162. At approximately 11:03 a.m. PT, around the time that Chernin and Fishoff were speaking to each other on the phone, InvBank 1 sent an over-the-wall confirmatory email to Chernin's Gold Coast email account. The wall-crossing confirmatory email stated in substance and in part:

> This is to confirm your conversation with [InvBank 1 Rep. C] on May 30, 2012, in which he communicated to you "Confidential Information" . . . concerning a proposed transaction by CPI Aerostructures Inc. Our disclosure included (i) the Issuer's name and (ii) the existence of a proposed transaction by the Issuer. Our disclosure may also include (iii) the type, amount

and basic terms of the securities that may be offered in the proposed transaction and (iv) the timing and general purpose of the proposed transaction and any other disclosed information.

The existence of the proposed transaction by CPI Aerostructures Inc is highly confidential. You have agreed to maintain in confidence the Confidential Information, and further agreed to use the disclosed information only for the purpose of evaluating the proposed transaction until such time as the Acknowledgement ceases to apply to the Confidential Information. You and any other representatives of your firm to whom the Confidential Information has been disclosed further agreed not to transact in the securities of CPI Aerostructures Inc until the earlier of such time as the Master Acknowledgment Agreement ceases to apply to the Confidential Information or until such time the Confidential Information is publicly announced or you receive written notification (in the form of an email) by [InvBank 1] of the termination or abandonment of the proposed transaction.

163. Due to the account settings for Chernin's Gold Coast email account, the over-the-wall confirmatory email was auto-forwarded to Fishoff's AOL account, thus apprising Fishoff that CPI Aerostructures was planning an offering and also putting Fishoff on notice of the wall-crossing trading restrictions.

164. The day after Chernin's wall-crossing, Chernin and Fishoff spoke frequently by phone, including for approximately fifteen minutes immediately after Chernin completed a call with InvBank 1 about the impending offering.

165. Between on or about May 30, 2012, when Chernin was wall-crossed, and on or about June 7, 2012, the last trading day before the public announcement of the offering, Fishoff, Chernin, and Petrello each short sold thousands of shares of CPI

stock ahead of the public announcement of the CPI Offering. None had ever before traded in CPI stock.

166. Specifically, at approximately 11:03 a.m. PST on or about May 30, 2012, Featherwood executed its first short sales in CPI stock at a price of approximately $14.49 per share, which is confirmed by an email with the subject line, "5/30 RECAP," that the executing broker sent to Fishoff and his assistant, Rothweiler, later that day. IP address records show that this first trade was executed from the SUBJECT PREMISES using an online trading platform.[25]

167. Additional trade "RECAP" emails from the executing broker to Fishoff and his assistant, Rothweiler, indicate that Chernin, via Cedar Lane, sold short approximately 5,000 shares of CVU stock on or about May 31 and June 1, 2012, for approximately $14.54 per share, approximately 4,000 shares of CVU stock on or about June 4, 2012, for approximately $14.75 per share, and approximately 7,000 shares of CVU stock on or about June 5, 2012 for approximately $14.55 per share.

168. Petrello also sold short CVU stock during this time period. His trading activity was preceded by phone communications with Fishoff. Specifically, the same day that Chernin was wall-crossed, on or about May 30, 2012, Fishoff and Petrello spoke by cellular telephone for more than six minutes. Less than a week later, Petrello traded in CVU stock for the

---

[25] The SEC's ISP spreadsheet shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about May 30, 2012 at approximately 14:03:40 p.m., from the SUBJECT PREMISES.

first time, short selling approximately 20,000 shares for
approximately $14.18 per share.

169. The CPI Offering was publicly announced on or about
June 7, 2012, just after markets closed.  The offering priced at
approximately $12 per share.  The following day, CPI opened at
approximately $12.49 per share and closed at approximately $12
per share, representing a decline of approximately 14.9% from
the previous day's opening price of approximately $14.10.

170. Fishoff, Chernin, and Petrello, via their respective
trading entities, covered their short positions soon after the
public announcement of the CPI Offering, making illegal profits.
Specifically, Fishoff, via Featherwood, made a profit of
approximately $92,110; Chernin, via Cedar Lane, made a profit of
approximately $54,231; and Petrello, via Brielle, made a profit
of approximately $98,706.

### The Ampio Offering
### (Announced After Markets Closed on July 12, 2012)

171. As set forth in the following paragraphs, on or about
July 9, 2012, Fishoff, on behalf of Featherwood, and Chernin, on
behalf of Cedar Lane, were wall-crossed by InvBank 4, which was
soliciting investors for an offering by Ampio Pharmaceuticals,
Inc. (NASDAQ: "AMPE") (the "Ampio Offering").

172. I believe, based on phone and email records, and as is
described more fully in the paragraphs below, that shortly after
they were wall-crossed, Fishoff passed the Inside Information
related to the Ampio Offering to Petrello, and Chernin passed
the Inside Information to Costantin.  Fishoff, Chernin,

Costantin, and Petrello then short sold the stock, and made a profit after the public announcement of the offering.

173. Based on InvBank 4's "Ampio Over the Wall" list, Chernin, on behalf of Cedar Lane, and Fishoff, on behalf of Featherwood, were solicited to participate in the Ampio Offering and brought over the wall at approximately 6:45 a.m. PT on or about June 9, 2012, which is corroborated by phone toll records showing calls between Chernin and phone numbers associated (based on email records) with InvBank 4 representatives; as well as a call between Fishoff and a phone number associated (based on email records) with an InvBank 4 representative.

174. Phone records show that after he was telephonically wall-crossed, Chernin called Costantin at approximately 7:03 a.m. PT, with the call lasting approximately three minutes, and at 7:08 a.m. PT, with the call lasting approximately six minutes.  Between these calls, at approximately 7:06 a.m. PT, Costantin's online trading account entered its first trade order for Cedar Lane, selling approximately 5,000 shares of Ampio stock via an online trading platform.  Approximately 11,000 shares of Ampio stock were short sold that day on behalf of Cedar Lane.

175. Chernin's online trading account entered its first trade order for Cedar Lane on or about July 10, 2012 at approximately 6:31 a.m. PT.  By on or about July 16, 2012, there were approximately 411,000 sell orders and approximately 11,000 buy orders.

176. Trading records show that Fishoff's online trading account entered its first trade order for Featherwood, selling short approximately 5,000 shares of Ampio stock on or about July 12, 2012 at approximately 12:04 p.m. PT. IP records show that the trade was executed from the SUBJECT PREMISES.[26]

177. Phone records show that during this time period, between on or about July 9 and July 13, 2012, Chernin, Fishoff, and Costantin spoke frequently with one another.

178. I believe, based on phone and trading records, that Fishoff tipped Petrello about the Ampio Offering. On or about July 9, 2012, at approximately 7:34 a.m. PT, Fishoff called Petrello's Point Pleasant number (732-280-2515), with the call lasting for more than approximately fifteen minutes. Petrello's online trading account entered Brielle's first trade order selling short approximately 3,800 shares of Ampio stock, via an online trading platform, at approximately 7:41 a.m. PT, apparently while Petrello was on the phone with Fishoff. Brielle sold short approximately 26,600 shares of Ampio stock that day. Between on or about July 9 and July 13, 2012, there were approximately 70,687 sell orders by Brielle, with no buy orders until August 2012. Fishoff had numerous additional calls with Petrello's Point Pleasant number during this time period.

179. Between on or about July 9, 2012, the same day that Fishoff and Chernin were wall-crossed, and on or about July 12,

---

[26] The SEC's ISP spreadsheet shows that IP address 173.55.242.36 was utilized by Fishoff's online trading account to execute the first trade on or about July 12, 2012 at approximately 12:04:57 p.m., from the SUBJECT PREMISES.

2012, Fishoff, Chernin, Costantin, and Petrello each short sold thousands of shares of Ampio stock ahead of the public announcement of the Ampio Offering, with Fishoff using an online trading platform to execute trades from the SUBJECT PREMISES.

180. The Ampio Offering was publicly announced on or about July 12, 2012, just after markets closed.  The offering was priced at approximately $3.25 per share.  The following day, Ampio shares opened at approximately $3.28 per share and closed at approximately $3.21 per share, representing a decline of approximately 10% from the previous day's closing price.

181. Chernin and Costantin, via Cedar Lane, covered their short positions soon after the public announcement of the Ampio Offering, making profits of approximately $186,459.  Petrello, via Brielle, also made profits of approximately $172,039.  An email that Petrello forwarded to Fishoff on or about August 2, 2012, which attached a July 2012 "Trader Profit Summary Report," shows that Petrello shared his profits from short-selling Ampio with Fishoff.

182. Email records show that, after the Ampio Offering, Fishoff and Petrello continued to hold some shares of Ampio stock.  On or about April 13, 2013, Petrello used his AOL account to email Fishoff's AOL account, stating in substance and in part:  "yoooooooooooooooo ii [sic] just saw where ampe closed nice mark!!!!!!!!!!!!"  Then, on or about June 4, 2013, Govender used his Google email account to email Fishoff's AOL account, writing:  "I heard that AMPE update yesterday to investors was v upbeat, Pos. Are you guys still holding or completely out?"

Fishoff used his AOL account to respond, stating: "long and strong." Based on my training and experience, I understand "long and strong" to mean that Fishoff was holding Ampio stock for a long period and that he viewed the performance of the stock as strong.

### The Biodel Offering
### (Announced After Markets Closed on June 18, 2013)

183. As set forth in the following paragraphs, on or about June 13, 2013, Govender, on behalf of Cedar Lane, was wall-crossed by William Blair & Company, L.L.C. ("InvBank 5"), the investment bank soliciting investors for a planned offering by Biodel Inc. (NASDAQ: "BIOD") (the "Biodel Offering").

184. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed, Govender passed the Inside Information related to the Biodel Offering to Fishoff and Chernin, and that Fishoff in turn relayed the Inside Information to Petrello. Chernin and/or Costantin, via Cedar Lane, and Petrello, via Brielle, then short sold the stock, and made a loss after the public announcement of the offering.

185. At approximately 9:00 a.m. PT on June 13th, a representative of InvBank 5 sent an over-the-wall confirmatory email to Govender, at his Cedar Lane and personal email accounts, confirming in substance and in part:

> We appreciate your interest in purchasing securities proposed for issuance by Biodel Inc., . . . about which we disclosed to you earlier certain nonpublic information, including, among other things, the issuer's

name and the timing, structure and size of
the transaction (the "Information").

As Sole Bookrunner for and on behalf of
Biodel Inc., we hereby confirm your
previously communicated agreement to treat
the Information as confidential. In
accordance with your agreement, you have
agreed not to provide the Information to any
person or entity other than those people
employed by or otherwise with a need to know
such information for the purpose of making a
decision to participate in the Proposed
Issuance and not to use the Information for
any other purpose or trade on it until the
issuer has publicly released such
information.

186. Due to the account settings for Govender's Cedar Lane
email account, the over-the-wall confirmatory email was
automatically forwarded to Fishoff at his AOL account, Chernin
at his Hotmail account, and Costantin at his Cedar Lane and AOL
accounts. Accordingly, Fishoff, Chernin, and Costantin were
alerted to an impending offering by Biodel and the wall-crossing
trading restrictions referenced in the confirmatory email.

187. Govender also manually forwarded the confirmatory
email to Chernin and Costantin's respective email accounts at
approximately 9:17 a.m. PT on June 13. In the body of this
email, Govender provided Inside Information to Chernin and
Costantin, including the ticker symbol of the issuer involved in
the CMPO, i.e., BIOD, and the timing of the deal pricing:

OTW [Over the Wall] for BIOD.
$15-20M CMPO.
Pricing Tues., 6/18. meeting w/ management on 6/18,
10:30am EDT.
more to follow.

188. Approximately one minute later, at approximately 9:18 a.m. PT, Chernin's online trading account caused Cedar Lane to short sell approximately 19,900 shares of BIOD stock.

189. Later that same day, on or about June 13, 2013, Cedar Lane short sold thousands of additional shares of BIOD stock. Shortly after speaking with Chernin by cellular telephone at approximately 11:53 a.m. PT, Fishoff's online trading account executed approximately 15,000 short sales in BIOD stock between approximately 12:27 p.m. PT through approximately 12:46 p.m. PT. The following morning, on or about June 14, 2013, Fishoff's online trading account caused Cedar Lane to short sell approximately 5,000 additional shares of BIOD stock, resulting in Cedar Lane holding a total short position of approximately 39,900 BIOD shares.

190. I believe, based on phone and trading records, that around this same time, Fishoff passed the BIOD tip to Petrello. Specifically, on or about June 13, 2013, at approximately 9:26 a.m. PT, less than approximately thirty minutes after the over-the-wall confirmatory email was automatically forwarded to Fishoff's AOL account, Fishoff used his cellular telephone to call Petrello's cellular telephone, and they spoke for approximately 4 ½ minutes.  That same day, on or about June 13, and continuing the following day, on or about June 14, 2013, Petrello's entity, Brielle, sold short approximately 31,000 shares of BIOD stock.

191. On or about June 18, 2013, at approximately 7:31 a.m. PT, Govender sent an email to Fishoff, Chernin, and Costantin

stating, in substance and in part, that he had placed an order
for 125,000 shares of BIOD.  At approximately 8:45 a.m. PT,
Govender emailed Fishoff, Chernin, and Costantin again,
observing in substance and in part:  "BIOD will trade well."

192.  Shortly thereafter, at approximately 9:42 a.m. PT on
June 18, 2013, and continuing through approximately 12:59 p.m.
PT, Chernin purchased approximately 12,900 shares of BIOD stock
in the Cedar Lane account to partially cover Cedar Lane's
approximately 39,900 share position, resulting in a short
position of approximately 27,000 shares.  In an email
communication to Fishoff's assistant, Rothweiler, Chernin
confirmed this purchase to cover, writing in substance and in
part:  "Bought 12,900 BIOD . . . . CEDAR."

193.  Between on or about June 13 and June 18, 2013, Cedar
Lane short sold thousands of shares of Biodel stock.  During an
overlapping time period, on or about June 13 and June 14, 2013,
Brielle also short sold thousands of shares of Biodel stock
ahead of the public announcement of the Biodel Offering.

194.  At market close on or about June 17, 2013, the stock
price of Biodel was approximately $4.39 per share, following a
positive news release related to a Biodel pharmaceutical drug
development program.  The stock price of Biodel continued to
increase the following day, prompting an email with subject
line, "Biodel Inc.," from Petrello to Fishoff that stated, in
substance and in part:  "RUNNING    IT DOESN'T END." (Gap in
text in original.)  Based on my training and experience,

Petrello was expressing frustration at the continuing increase
in the stock price of Biodel.

195. The BIOD offering was publicly announced after the
market closed on or about June 18, 2013.  Over the next few
days, between on or about June 19 and June 21, 2013, Cedar Lane
covered its approximately 47,000 BIOD shorts with a purchase of
approximately 47,000 shares.  In contrast to their profitable
short selling with respect to the other subject securities, the
Subjects lost money short selling BIOD stock via Cedar Lane,
experiencing a total loss of approximately $7,400.

196. On or about June 24, 2013, Costantin emailed Govender,
confirming in substance and in part:  "The loss on BIOD was
8,449.53."  Shortly thereafter, on or about July 2, 2013,
Fishoff's assistant, Rothweiler, sent an email to Govender's
Cedar Lane email account, with subject line "Profit/Loss
Report," stating in substance and in part:

> Your run from November through June is attached.
> The breakdown by month is below along with the
> calculations of your portion.  If you have
> questions regarding this matter please email me
> your concerns and I will look into them.
>
> Nov 2012-$2819.64
> Dec 2012 $0
> Jan 2013 -$23,855.07
> Feb 2013 -$8833.72
> March 2013 $0
> April 2013 $0
> May 2013 -$35214.42
> June 2013 $81462.88
> Total P/L $10,740.03
> Your portion 33% = *$3554.21*

197. Attached to this July 2, 2013 email was a Cedar Lane "Profit Details Report" for the period from on or about November 1, 2012, through on or about June 30, 2013, identifying Govender, or "DG," as "TRADER 10." The report also reflected Cedar Lane's purchases of allocated shares but, notably, it did not reflect the Subjects' shorting of Biodel stock.

*The AEZS Offering*
*(Announced After Markets Opened on July 25, 2013)*

198. As set forth in the following paragraphs, on or about July 15, 2013, Govender, on behalf of Cedar Lane, was wall-crossed by Burrill Securities ("InvBank 6"), the investment bank soliciting investors for an offering by Aeterna Zentaris Inc. (NASDAQ: "AEZS") (the "AEZS Offering").

199. I believe, based on phone and email records, and as is described more fully in the paragraphs below, that shortly after being wall-crossed, Govender passed the Inside Information related to the AEZS Offering to Chernin, who then passed it on to Fishoff, and that Fishoff in turn relayed the Inside Information to Petrello. Fishoff and Petrello short sold the stock, and profited after the offering was publicly announced:

200. On or about July 15, 2013, at approximately 6:55 a.m. PT, Govender used his cellular telephone to call a phone number that, based on email records, is associated with an InvBank 6 representative. This call lasted for more than approximately seven minutes. Govender likely was wall-crossed during this phone conversation, which is corroborated by InvBank 6's

"Investor Contact Log," which lists Govender of Cedar Lane as being contacted and over-the-wall that day.

201. Govender's next outbound call, after being wall-crossed on AEZS, was to Chernin at approximately 7:35 a.m. PT, and then, approximately one minute later, Govender called Costantin. Govender's calls with Chernin and Costantin each lasted approximately nineteen minutes, likely indicating that he was speaking with both Subjects simultaneously, via conference call.

202. While the conference call between Govender, Chernin, and Costantin was still ongoing, InvBank 6 sent an over-the-wall confirmatory email to Govender at his Cedar Lane email account at approximately 7:41 a.m. PT. The email noted:

> We would like to discuss with you some confidential information relating to the potential sale of securities by Aeterna Zentaris, Inc. but only upon your agreement that it will be handled in ways consistent with both law and your internal policies. By accepting this information, you agree that you and your firm are "over-the-wall" and that this information will not be circulated within your firm other than on a need to know basis, and that it will not circulate outside your firm, whatsoever. The only confidential information we would like to share with your firm at this point is the fact that Aeterna Zentaris, Inc. is considering the potential sale of securities. Please confirm your understanding and agreement of the above by return mail.

203. Due to the account settings of Govender's Cedar Lane email account, this over-the-wall confirmatory email, which includes Inside Information of "the potential sale of

77
Instrumentality Protocol

securities" of AEZS, was auto-forwarded to Fishoff's AOL account and Costantin's AOL account.

204. I believe, based on phone and email records, that Fishoff then may have tipped Petrello about the AEZS Offering. At approximately 10:10 a.m. PT, on or about July 15, 2013, Fishoff used a landline at the SUBJECT PREMISES to call Petrello's cellular telephone, and they spoke for approximately 17 minutes. Starting that same day, on or about July 15, and continuing through on or about July 24, 2013, Chernin, via Cedar Lane, and Petrello, via Brielle, each short sold more than approximately 100,000 of shares of AEZS stock ahead of the public announcement of the offering.

205. On or about July 23, 2013, at approximately 2:01 p.m. PT, an InvBank 6 representative sent an email to Govender at his Cedar Lane account, with subject line, "looking at tomorrow night for AEZS," indicating that the AEZS transaction would be priced the following evening. This email was automatically forwarded to Fishoff's AOL account, and Fishoff then forwarded the email to Petrello's own AOL account at approximately 2:46 p.m. PT, thereby providing to Petrello, Inside Information related to the timing of the AEZS Offering.

206. The AEZS Offering was publicly announced a few days later, just after markets opened on or about July 25, 2013. The offering was priced at approximately $1.50 per share. AEZS shares opened at approximately $1.50 per share and closed at approximately $1.40 per share.

207. Cedar Lane covered its short position soon after the public announcement of the AEZS Offering, making approximately $33,929 in profits after Govender/Cedar Lane received Inside Information of the offering.  Petrello's entity, Brielle, made approximately $52,031 in profits.

208. In summary, from in or about in or about June 2010 to as late as in or about July 2013, the Subjects reaped more than approximately $3.2 million in illicit profits owing to the secondary offering insider trading scheme described above.

209. In addition to the offerings referenced above, email records show that one or more Subjects was wall-crossed and restricted from trading in connection with several other offerings, including but not limited to the following:

a. Govender was wall-crossed, on or about October 3, 2013, in connection with an offering by NeoStem Inc. (NASDAQ: "NBS");

b. Chernin was wall-crossed, on or about October 8, 2013, in connection with an offering by CytRx Corporation (NASDAQ: "CYTR");

c. Govender was wall-crossed, on or about October 14, 2013, in connection with an offering by RedHill Biopharma Ltd. (NASDAQ: "RDHL");

d. Govender was wall-crossed, on or about October 14, 2013, in connection with an offering by Lion Biotechnologies Inc. (OTC[27]: "GNBPD");

e. Costantin was wall-crossed, on or about May 5, 2014, in connection with an offering by Comstock Mining, Inc. (NYSE: "LODE"); and

f. Govender was wall-crossed, on or about June 17, 2014, in connection with an offering by Phosphagenics Limited (OTC: "PPGNY").

210. The investigation is still ongoing as to whether the Subjects short sold the securities of these issuers during the restricted trading period.

### Other Potentially Illicit Trading by the Subjects

211. There is also probable cause to believe that the Subjects engaged in other insider trading schemes, including schemes to trade ahead of the public announcement of a merger and a licensing agreement.

*ASML's Acquisition of Cymer*
*(Announced on October 17, 2012)*

212. Certain Subjects traded ahead of the public announcement, on or about October 17, 2012, of the acquisition of Cymer, Inc. ("Cymer")[28] by ASML Holding NV ("ASML") (the "ASML-Cymer Deal").

---

[27] Based on my training and experience, I know that "OTC" stands for "over-the-counter" and refers to over-the-counter equity securities that are not listed on NASDAQ, NYSE, or a national stock exchange.

[28] Cymer traded on NASDAQ under the ticker symbol "CYMI."

213. Pursuant to the terms of the ASML-Cymer Deal, ASML planned to acquire Cymer for approximately 1.95 billion euros (then approximately $2.6 billion), constituting a premium of approximately 70 percent to Cymer's closing share price the day before the announcement.

214. The government has thus far been unable to find email or phone record evidence indicating that the Subjects received or had the opportunity to receive Inside Information on this merger. However, on or about October 16, 2012, just one day before the public announcement of the ASML-Cymer Deal, Fishoff, via Featherwood and other entities, purchased thousands of shares of Cymer stock using an online trading platform. IP address records show that Fishoff executed the first of these online trades from the SUBJECT PREMISES.[29] That same day, Petrello, via Brielle, and Chernin and/or Costantin, via Cedar Lane, also purchased thousands of shares of Cymer stock.[30] None had ever traded in Cymer stock before. Based on my training and experience, the Subjects appear to have had inside information because they took a substantial position in Cymer stock just one day before the public announcement of Cymer's acquisition at a premium, which usually has the effect of increasing the target company's stock price.

---

[29] The SEC's ISP spreadsheet shows that IP address 173.55.236.195 was utilized by Fishoff's online trading account to execute the first trade on or about October 16, 2012 at at approximately 9:39:59 a.m., from the SUBJECT PREMISES.

[30] Initially, both Fishoff and Petrello purchased shares of ASML. Based on my training and experience, this indicates that Fishoff and Petrello may not have known at the time whether ASML would be the target or the acquiror in the transaction.

215. Shortly after the public announcement of the ASML-Cymer Deal the following day, on or about October 17, 2012, Fishoff and Petrello, as well as Chernin and/or Costantin, sold their respective shares of Cymer stock and collectively made approximately $700,000 in profits.

## The Sangamo Licensing Agreement
### (Announced January 9, 2014)

216. There is also probable cause to believe that certain Subjects traded ahead of the January 9, 2014, public announcement of an exclusive worldwide collaboration and license agreement between two pharmaceutical companies, Sangamo BioSciences, Inc. (NASDAQ: "SGMO") and Biogen Idec Inc. (NASDAQ: "BIIB") (the "Sangamo Licensing Agreement").

217. On or about December 5, 2013, Winson Tang ("Tang"), a resident of Richmond, California and Vice President of Clinical Research at Sangamo, based in Richmond, California, was informed of Sangamo's negotiations with BIIB during a senior management meeting.

218. Shortly thereafter, between on or about December 7 and on or about December 13, 2013, Tang exchanged numerous calls with Govender. Based on email records, Tang and Govender were longtime friends who at one point considered launching a separate joint business venture together.

219. Around this same time period, Govender also exchanged numerous calls with Chernin and Costantin, and at least one call with Fishoff. On or about December 16, 2013, at approximately 9:51 a.m. PT, Tang tried calling Govender. Shortly thereafter,

at approximately 10:38 a.m. PT, Govender held a conference call
with Chernin and Costantin for approximately seven minutes.
Immediately after the call ended, Costantin tried calling
Fishoff.   Approximately one minute later, at approximately 10:46
a.m. PT, Cedar Lane began purchasing numerous shares of Sangamo
stock.   Fishoff's entity, Featherwood, also began purchasing
Sangamo stock at approximately 10:52 a.m. PT, through an online
trading platform.   That same day, Fishoff's next-door neighbors,
Neil and Jacquelyn Paul, started purchasing shares of Sangamo
stock as well, ultimately purchasing approximately 11,500 shares
of Sangamo stock between on or about December 16 and December
19, 2013.

220. Later that day, at approximately 11:06 a.m. PT, on or
about December 16, 2013, Fishoff and Petrello spoke by phone for
approximately four minutes.   During or immediately after his
call with Fishoff, Petrello, via Brielle, also began to purchase
numerous shares of Sangamo stock.

221. Between on or about December 16 and December 23, 2013,
Featherwood purchased a total of approximately 59,000 shares of
Sangamo stock.   During this time period, Govender remained in
constant phone contact with Fishoff, Chernin, and Costantin and
also had further communications with Tang.

222. Additionally, on or about December 17, 2013,
Featherwood purchased approximately 400 Sangamo call options[31] at

---

[31] A call option is an agreement that gives an investor the
right (but not the obligation) to buy a stock at a specified
price within a specific time period.   See "Call Option,"
*(footnote cont'd on next page)*

a contract price of approximately $10 per share and an expiration date of on or about January 18, 2014. Based on my training and experience, I know that a trader will often select an option expiration date that coincides with when the trader expects the price of that stock to increase, so that the resulting value of the stock is higher than the option agreement price at which the trader purchased the stock. That same day, Petrello purchased approximately 5,000 shares of Sangamo stock.

223. Then, on or about December 20, 2013, at approximately 3:47 p.m. PT, Tang called Govender and they spoke for more than fifteen minutes. That same day, Cedar Lane purchased approximately 250 Sangamo call options at a contract price of approximately $12 per share and an expiration date of on or about January 18, 2014.

224. Additionally, between on or about December 20 to December 23, 2013, Petrello's entity, Brielle, purchased approximately 40,500 shares of Sangamo stock.

225. Further trading occurred on or about December 23, 2013. At approximately 12:49 p.m. PT, Govender called Chernin for approximately two minutes. As soon as that call ended at approximately 12:51 p.m. PT, Chernin called Fishoff for approximately two minutes. At approximately 12:53 p.m. PT, Featherwood and another trading entity associated with Fishoff executed a purchase of approximately 20,000 shares of Sangamo

---

Investopedia, available at:
http://www.investopedia.com/terms/c/calloption.asp.

stock.  Later that evening, Govender placed several calls to Tang.

226. The following day, on or about December 24, 2013, at approximately 6:24 a.m. PT, Govender sent an email, with no text, to Fishoff, Chernin, and Costantin with the subject line, "Ron [Chernin], will call to update. nothing has changed." At approximately 6:26 a.m. PT, Chernin emailed Govender, responding:  "Plz answer the phone or call now.  I am getting major pressure.  Thnx[.]"  Then, at approximately 6:28 a.m. PT, Govender replied by email to Chernin, writing in substance and in part: "I will call, my phone has issues and trying to get it fixed.  What is your cell?  I will call u on Skype[.]"  Chernin responded at approximately 6:35 a.m. PT with his cell phone number.

227. A few minutes later, Govender tried to reach Chernin on the phone.  Chernin called Govender back one minute later, and they spoke for approximately a minute and a half.  Those calls were immediately followed by a call from Chernin to Fishoff, and then calls from Petrello to Fishoff.  Govender also called Chernin again, with the call lasting more than three minutes.  That same day, the Subjects' trading entities, Featherwood, Cedar Lane, and Brielle, all began to sell off portions of their Sangamo positions.  For example, Featherwood sold approximately 23,500 shares of Sangamo stock and Brielle sold approximately 2,000 shares of Sangamo stock.

228. Starting the early morning of December 26, 2013, Govender exchanged multiple calls with Fishoff, Chernin, and

Costantin, and Fishoff received a call from Petrello.  After these calls, the Featherwood and Brielle accounts resumed making purchases of Sangamo stock.  Brielle purchased approximately 5,000 shares of Sangamo stock on or about December 30, 2013, and the following day, Featherwood purchased approximately 152 Sangamo call options at a contract price of approximately $12 per share and an expiration date of on or about January 18, 2014.

229. On or about January 2, 2014, at approximately 2:55 p.m. PT, Govender spoke by phone with Tang for more than seven minutes.  Shortly thereafter, between approximately 3:41 p.m. PT and 3:44 p.m. PT, Govender and Chernin tried calling each other multiple times.

230. On or about January 6, 2014, Fishoff's assistant, Rothweiler, sent an email to Govender, copying Costantin, attaching a Cedar Lane Profit Details Report for Govender ("TRADER 10") that reflected Cedar Lane's purchase of approximately 40,000 shares of Sangamo stock on or about December 24, 2013.  The next day, on or about January 7, 2014, Govender spoke with both Costantin and Fishoff by phone.

231. Then, on or about January 8, 2014, at approximately 6:18 a.m. PT, Costantin called Govender and they spoke for almost eleven minutes.  Around this same time, between on or about January 7 and January 8, 2014, Cedar Lane purchased approximately 250 Sangamo call options with a contract price of approximately $10 per share and an expiration date of on or about February 22, 2014.

232. On or about January 9, 2014, at approximately 4:00 a.m. PT, the Sangamo Licensing Agreement was publicly announced, causing the price of Sangamo stock to increase approximately 38% to approximately $18.88 per share by market close.

233. Shortly after the public announcement of the Sangamo Licensing Agreement on or about January 9, 2014, Govender received approximately two calls from Tang, one of which lasted for almost sixteen minutes, and exchanged numerous calls with Fishoff, Chernin, and Costantin. Govender remained in phone contact with all of these individuals over the next few days.

234. On or about January 10, 2014, at approximately 4:49 a.m. PT, Govender sent an email to Fishoff, Chernin, and Costantin with the subject line, "Fwd: SGMO: Sangamo BioSciences, Inc. – Sangamo Inks Deal for Hemoglobinopathies; Increasing Price Target to $22[.]" In the body of the email, Govender wrote: "Raised PT [price target] to $22[.]" That same day, at approximately 9:16 a.m. PT, Govender and Tang spoke by phone for more than three minutes.

235. After the public announcement of the Sangamo Licensing Agreement, the Subjects, via their respective trading entities, sold their holdings in Sangamo securities, making profits totaling more than $1.2 million. Records from the Federal Reserve Bank of New York, which I have reviewed, show that on or about February 12, 2014, Govender received, through an entity he

controls[32], a wire transfer of approximately $222,788 from Cedar Lane.

236. On or about December 12, 2014, the FBI approached Tang and he agreed to be interviewed. The interview took place in his office at Sangamo. During the interview, Tang stated, in substance and in part, that:

a. Up until their falling out over a joint venture deal in or about August 2014, he considered Govender – with whom he had an approximately ten-year friendship – to be "like a brother";

b. He had frequently provided Govender scientific analysis and that Govender paid him on approximately two occasions;

c. Govender was in the business of obtaining nonpublic information about companies in order to sell it or pass it to hedge funds that would trade on the information, and claimed that Govender made money through "hot tips" and insider trading;

d. He had, on occasion, provided nonpublic information to Govender, but claimed that he had never obtained any money or gifts from Govender in exchange for the nonpublic information;

e. At the time that their joint venture deal fell apart in or about August 2014, Govender informed Tang that he

---

[32] Email records show that Govender controls this entity.

had made a million dollars the prior year with the information
that he had obtained from Tang; and

      f.    With respect to the Sangamo Licensing Agreement,
Tang admitted that he learned inside information about the deal
approximately six months prior to the public announcement of the
deal, and admitted that, although he could not specifically
recall tipping Govender about the deal, it was possible that he
had done so, since Govender was constantly "pumping" him for
information.

    237. The investigation is still ongoing as to whether
Fishoff, Chernin, Costantin, and/or Petrello knew that Govender
obtained, or may have obtained, inside information related to
the Sangamo Licensing Agreement from a source at Sangamo,
whether Tang or otherwise.

### Evidence of the Subjects' Insider Trading Schemes Likely Remains at the SUBJECT PREMISES

    238. There is probable cause to believe that evidence of
the Subjects' execution of insider trading schemes is present at
the SUBJECT PREMISES.  The SUBJECT PREMISES is the business
location of the Featherwood trading enterprise run by Fishoff,
who also resides at the SUBJECT PREMISES.

    239. Based on my training and experience, and on
conversations with other law enforcement officers, I know that
in securities fraud matters, individuals, particularly those who
are operating a securities trading business, with multiple
traders executing numerous trades on a monthly basis, often
maintain documents, such as lists of stocks to be traded,

trading information for those stocks, brokerage account
information, bank account and wire transfer information,
correspondence and memos, and names of coconspirators at their
base of operations, which, in the case of Fishoff and his
Featherwood trading operation during the time period of the
schemes described above, is the SUBJECT PREMISES.  This is
particularly true where, as here, the profits due to traders are
calculated and generated in the form of payroll reports that are
disseminated in-house, by the trading operation, rather than
through a third-party payroll provider.  As set forth above and
based on my review of email records, on numerous occasions,
Fishoff's assistant, Rothweiler, circulated "Profit Detail
Reports" to the Subjects that showed, on a monthly basis, trades
by each individual trader, identified the stocks traded by
ticker symbol, and set forth the net profits due to that
particular trader.

          240. Additionally, statements from Fishoff's bank accounts
and prime brokerage accounts from in or about June 2010 through
in or about March 2015, which were obtained by law enforcement,
identify the SUBJECT PREMISES as Fishoff and/or Featherwood's
address of record, as do Featherwood's trading blotters.  For
example, the SUBJECT PREMISES is listed as the address for
several of the bank accounts and one of the prime brokerage
accounts into which proceeds of the insider trading schemes were
transferred, namely Fishoff's Union Bank account, the
Featherwood Union Bank account that Fishoff controlled, and
Featherwood's Prime Broker A account.  As such, there is

probable cause to believe that the bank statements and prime brokerage statements for these accounts were mailed to, and maintained within, the SUBJECT PREMISES.

241. Not only is Fishoff operating Featherwood from the SUBJECT PREMISES, but also Gold Coast. From email records, I reviewed a letter dated on or about November 1, 2013, on Gold Coast letterhead, in which Fishoff identifies the SUBJECT PREMISES as the business address for Gold Coast. In the letter, Fishoff writes in substance and in part:

> I am writing in response to your request for a beneficial owner as it related to [G]old Coast Total Return, Inc.
>
> In connection therewith, I am [sic] hereby represent and warrant that:
>
> - Gold Coast Total Return, Inc. (the "Corporation") is a corporation comprised of the following officers and no other party (neither individual nor entity) has any interest in the Company: Steve Fishoff 2648 Featherwood Street Westlake Village, CA 91362 [the SUBJECT PREMISES].
>
> - The management of the Corporation is vested in the following sole officer and sole shareholder: Steve Fishoff 2648 Featherwood Street Westlake Village, CA 91362 [the SUBJECT PREMISES]. . . .
>
> Sincerely,
>
> Gold Coast Total Return, Inc.
>
> By: _____
>     Name:  Steve Fishoff
>     Title:  President

242. Further, from my training and experience, I know that individuals engaged in complex white collar crimes, such as

insider trading schemes, often maintain such information in documents kept in both paper and electronic form. Indeed, Fishoff's email records reveal that he received electronic notifications confirming trades in his prime brokerage accounts, including the trades related to several of the offerings discussed above, and that notifications were emailed to his AOL account at least as recently as in or about October 2013. There is probable cause to believe that Fishoff would retain these types of documents and items in his residence/business location for Featherwood, particularly since email records, business records, and Fishoff's income tax returns[33] indicate that he was self-employed from at least 2002 through the present, and since he traded personally in the subject securities on his own behalf.

243. In my training and experience, the maintenance of these brokerage-related records, whether in hard copy or electronic form, is particularly common where a trader maintains a home office. In this case, Fishoff's home office is situated within the SUBJECT PREMISES. Law enforcement has obtained invoices from several business-related service providers, which invoices show that Fishoff is conducting business from the SUBJECT PREMISES.

---

[33] By an ex parte Court order issued in the District of New Jersey, the Government received authorization to obtain income tax return returns and information for Fishoff, Chernin, Costantin, Petrello, Featherwood, Gold Coast, Seaside, Cedar Lane, Brielle, and certain other entities. The Government has received a partial production of these records from the Internal Revenue Service, including tax return information for both Fishoff and Featherwood.

244. From the email records, I reviewed a June 27, 2013 invoice from ENG Communications, Inc. ("ENG Invoice 1"), which identifies the "Bill To" and "Ship To" party as Fishoff at the SUBJECT PREMISES. ENG Invoice 1 shows Fishoff's purchase of numerous pieces of computer and telecommunications equipment, for a total purchase price of approximately $25,190.38. The computer and telecommunications equipment includes six 24-inch computer monitors, four "Dell I7 Business Grade Computers," two "Wireless Keyboard + Mouser Combo," twelve "Panasonic Station Phones," five "Panasonic Digital Cell Site," and seven "Cordless Panasonic digital phone system phones." The ship date is June 27, 2013 and the invoice notes that payment is due upon receipt. ENG Invoice 1 is attached to a July 16, 2013 email from an ENG representative to Fishoff at his AOL account. In the body of the email, the ENG representative writes, in substance and in part:

> Your invoice is attached.
> Paid 07/01/13 - $15000
> Open balance: $10190.38
>
> Please take care of the open balance at your earliest convenience.

Based on my training and experience, and in the context of the attached invoice, I understand this email to mean that the computer and telecommunications equipment listed in the ENG Invoice were delivered to Fishoff at the SUBJECT PREMISES and that he made a partial payment for the goods upon receipt.

245. Based on my training and experience, individuals, particularly business owners such as Fishoff, usually upload

information from old computers onto new computers and/or retain
the old computers for the information contained therein.

246. ENG emailed another invoice ("ENG Invoice 2") to
Fishoff at his AOL account on or about November 6, 2013.  ENG
Invoice 2, in the amount of approximately $666.63, is dated
November 6, 2013, identifies the "Bill To" and "Ship To" party
as Fishoff at the SUBJECT PREMISES, and itemizes, among other
things, the performance of the following services:

> Fixed corrupted AOL 9.7 software by reinstalling
> program
> Connected and programmed 2 fax systems in **two offices**
> [emphasis added]
> Configured scanning on 2 computer system [sic]
> . . .
> Programmed Panasonic phone system to have call waiting

Based on my training and experience, I know that AOL 9.7
software allows users to, among other things, communicate via
AOL email and via AOL instant messaging ("AIM").

247. From the email records, I also reviewed a November 4,
2013 invoice from Bloomberg Finance L.P. (the "Bloomberg
Invoice"), which is billed to Fishoff with the SUBJECT PREMISES
identified as the billing and customer address.  The Bloomberg
Invoice itemizes two purchases by Fishoff, namely a nineteen-
inch flat panel Bloomberg computer terminal for approximately
$450 and a two-month subscription to "Bloomberg Anywhere" for
approximately $5,925, for a total amount due and owing of
approximately $6,408.75.  Based on my training and experience, I
know that the Bloomberg computer terminal purchased by Fishoff
is a highly specialized, proprietary computer system provided by

Bloomberg to professionals in finance and other industries to access the Bloomberg Professional service through which users can monitor and analyze real-time financial market data and place trades on the electronic trading platform. Based on my training and experience, I also know that the "Bloomberg Anywhere" service allows Bloomberg customers, such as Fishoff, to remotely access their Bloomberg Professional service account from an Internet-ready desktop or laptop, allowing users to log on and access the same real-time trading data and personal files that they can access using their primary Bloomberg computer terminal.

248. The email records also show that Fishoff maintained database backups for his electronic information, including backups of brokerage account information. On or about August 5, 2013, Fishoff received, via his AOl account, an email from a vendor that attached an invoice for "data recovery." In the body of the email, the vendor representative wrote, in substance and in part:

> I've attached an invoice for the work . . . performed July 24th. Account data (companies, brokers, and contacts) from the deleted Fagan accounts was **retrieved from the database backups** [emphasis added] and merged into the DealTrak live databases, and made visible to your account alone.

The attached invoice is directed to Fishoff at the SUBJECT PREMISES and states, in substance and in part:

> Emergency Data Recovery Service (July 24, 2013) Locate (from backups) deleted account and broker records Merge recovered data into DealTral [sic] live database + Total Item Cost 5 hrs $120/hr  $600

Based on my training and experience, I know that business owners, such as Fishoff, frequently backup their computer data and can recover deleted data from those backups, as confirmed by the above-described email and attached invoice. Additionally, since USPIS mail forwarding records indicate that Fishoff was staying at his Palm Springs residence from on or about October 29, 2014 to on or about May 2, 2015, it is unlikely that Fishoff was on-site at the SUBJECT PREMISES, deleting computer and other electronic data stored at the SUBJECT PREMISES during that time period.

249. Additionally, as set forth in this affidavit above, it is apparent from subpoenaed IP records covering the time period from in or about February 2011 through in or about October 2012, that several trades executed in connection with the Subjects' insider trading schemes, specifically multiple trades executed via Fishoff's online trading accounts, were made from the SUBJECT PREMISES.

250. In addition, Fishoff's email communications with coconspirators and others show that Fishoff performed work at the SUBJECT PREMISES from at least as early as in or about May 2011 through at least as late as in or about January 2013. For instance, in the subject line of an email dated on or about May 12, 2011, Fishoff wrote to Rothweiler, his assistant: "no need to work from myhouse [sic] tom, i'll have u hear [sic] next week either tues or wed." As described above, this same assistant of Fishoff sent and received numerous emails and attachments

memorializing illicit securities transactions conducted by
Fishoff, Chernin, and Costantin in connection with the insider
trading schemes.

251. In another email communication with Rothweiler on or
about January 17, 2013, Fishoff wrote: "send this back to me
when i get home filled out and ill [sic] stamp johns name."
These email communications and the vendor invoices referenced
above provide probable cause to believe that Fishoff maintains a
home office at the SUBJECT PREMISES.

252. Further, law enforcement and other agencies have
obtained several corporate records that denote the SUBJECT
PREMISES as the address of record. For example, in a document
obtained from another agency entitled, "Introducing Firm
Certification" and dated on or about May 14, 2012, Fishoff
appeared to represent and agree to be the beneficial owner of
several DBA accounts, including Data Complete, Gold Coast, and
Seaside. Fishoff, with an address that corresponds to the
SUBJECT PREMISES, appears to have signed the Certification as
Individual/Beneficial Owner of Featherwood.

253. During the course of the ongoing investigation, law
enforcement utilized a mail cover, i.e., a recording of
information from the outside of letters and parcels before they
are delivered, on the SUBJECT PREMISES. The mail cover has
produced evidence of mailings from several financial
institutions to Fishoff at the SUBJECT PREMISES as late as in or
about November 2013, when the mail cover ended, including
mailings from brokerage firms and Union Bank. Law enforcement

recently reinitiated the mail cover, which has produced evidence of continued mailings to Fishoff at the SUBJECT PREMISES.

254. As set forth in detail above, Fishoff's numerous telephonic communications, both cellular and landline, with coconspirators and others further provides probable cause to believe that evidence and/or fruits of the insider trading schemes may be found within the SUBJECT PREMISES, from the time period from in or about June 2010 through at least as late as in or about February 2014. At least one of Fishoff's landline telephone numbers, namely 805-241-9447, appears to have been used in furtherance of the insider trading schemes, based on the timing of phone communications utilizing this number and subsequent trades. Billing records provided by Verizon for the 805-241-9447 number identify the SUBJECT PREMISES as the address of record. Verizon cellular telephone number 805-660-9447, which also appears to have been used by Fishoff in furtherance of the scheme based on the timing of phone communications utilizing this number and subsequent trading, similarly has the SUBJECT PREMISES as the address of record.

255. Fishoff's personal resume, sent via email at least as recently as in or about September 2013 and obtained by law enforcement, also lists the SUBJECT PREMISES as Fishoff's address. Further, the resume lists Fishoff's telephone number of 805-241-9447. As mentioned above, billing records provided by Verizon for this number, in or about March 2014, identify the SUBJECT PREMISES as the address of record. On the resume, Fishoff indicates that Featherwood is located in Westlake

Village, California, the city in which the SUBJECT PREMISES is located.

256. Law enforcement has also obtained an email dated on or about August 28, 2013 from Fishoff's AOL account, jfishoff@aol.com, to a"jfishoff2@aol.com," who appears to be Fishoff's son, Jason.  Attached to the email is a document entitled, "TradingAuthorization featherwood jason and steve.doc."  The document, which appears to grant trading authorization to Steven Fishoff and Jason Fishoff with respect to Featherwood, lists the SUBJECT PREMISES as the address of record.

257. Additionally, as shown in numerous "payroll" spreadsheets that Fishoff caused to be circulated to his team of traders, which included Chernin, Costantin, Govender, and others, Fishoff compensated them on a monthly basis based on the trading profits of Featherwood and/or its affiliated entities. It is my experience and the experience of other law enforcement officers with whom I have spoken that individuals often maintain payroll records for their employees at their place of business. Here, the place of business is the SUBJECT PREMISES. Accordingly, there is probable cause to believe that Featherwood and related entity payroll reports will be maintained at the SUBJECT PREMISES.

258. Additionally, based on my review of records from Union Bank and the Federal Reserve Bank of New York, Fishoff, via Featherwood, wired or caused the wire of payroll payment funds totaling several hundred thousand dollars directly to Chernin,

Costantin, Govender, and others. In an effort to conceal their sharing of profits amongst themselves, Chernin received some of the funds from Featherwood through an entity that corporate records show that he controlled, namely Morgan Lane, and Costantin received some of his share of the profits through entities that corporate records show that he controlled, namely Riverside Capital Resources and Shore Resources, respectively. Fishoff also caused Featherwood to wire large sums totaling approximately $1 million directly to Costantin's personal and business accounts.

259. Based on records from Chase Bank and the Federal Reserve Bank of New York, Petrello in turn compensated Fishoff for the offering-related Inside Information, wiring at least several hundred thousand dollars to Fishoff over the course of the scheme through Point Pleasant and/or other entities that Petrello controlled. It is my experience and the experience of other law enforcement officers with whom I have spoken that individuals often keep records of their personal and business financial transactions, including calculations and disbursements of illicit profits, at their residence or place of business, which, in the case of Fishoff, are both located at the SUBJECT PREMISES.

260. Based on my training and experience, and on conversations that I have had with other law enforcement officers, I am familiar with the practices and methods of persons who engage in complex financial crimes and their reliance on computer technology to commit these criminal

offenses, particularly where, as here, the criminal activity is executed through a business operation. Such individuals often create and maintain records relating to the conduct, including correspondence and memos, receipts, telephone records, bank account and financial information, notes and personal documents, and the names of coconspirators and any victims, on electronic databases on computers and other digital devices, stored in electronic or magnetic form. Furthermore, users of computer and other digital device equipment often create and maintain records of ownership and subscriptions to Internet services. Based on this information, and on the facts set forth above, including the frequent use of email, IP addresses registered to Fishoff at the SUBJECT PREMISES, and Fishoff's use of a cellular telephone and one or more landlines with the SUBJECT PREMISES as a billing address, there is probable cause to believe that computer- and other digital device-related equipment that may contain evidence of the crimes described above may be found at the SUBJECT PREMISES.

## V.  ITEMS TO BE SEIZED

261. Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in ATTACHMENT B, which constitute evidence of the Specified Federal Offenses, will be found at the SUBJECT PREMISES. The items to be seized, which are described more specifically in ATTACHMENT B, consist of, among other things, evidence of the Specified Federal Offenses in the form of, among other things, financial records, electronic communications (including, but not limited

to, email communications, voicemails, text messages, and instant
messages), digital devices, digital device programs, paper
records, documents, and proceeds of the crime, including cash.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

262. As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; peripheral input/output devices, such
as keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices,
such as modems, routers, cables, and connections; storage media,
such as hard disk drives, floppy disks, memory cards, optical
disks, and magnetic tapes used to store digital data (excluding
analog tapes such as VHS); and security devices. Based on my
knowledge, training, and experience, as well as information
related to me by agents and others involved in the forensic
examination of digital devices, I know that data in digital form
can be stored on a variety of digital devices and that during
the search of a premises it is not always possible to search
digital devices for digital data for a number of reasons,
including the following:

a. Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment. There are so many types of digital

devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive

could contain as many as approximately 450 full run movies or 450,000 songs.

         d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.   Recovery also can require substantial time.

          e.    Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.   Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.   Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).   Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.   Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.   Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.   Computer file systems can

record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

        f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

        g.    Off-site review of the data is warranted based on
the potentially high number of digital devices at issue, given
the invoices referenced above that reflect that Fishoff is
storing numerous forms of computer and telecommunications
equipment at the SUBJECT PREMISES; the complex nature of this
case that will require the review of, among other things,

numerous email, trading and payroll records; the Subjects' use of password-protected trading platform(s) that might make review difficult; the labor-intensive task of segregating data related to the commission of the Specified Federal Offenses from any lawful personal and business-related data that may be present on the digital devices; and that fact that bonds of affection between Fishoff, the owner of the SUBJECT PREMISES, and certain Subjects – including but not limited to, his brother-in-law, Costantin, and long-time friends and business associates, Chernin and Petrello – raise the risk of destruction of evidence to protect these coconspirators and others.

263. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

264. For all the reasons described above, there is probable cause to believe that evidence of the Specified Federal Offenses, as described above and in ATTACHMENT B of this
//

affidavit, will be found in a search of the SUBJECT PREMISES, as
further described above and in ATTACHMENT A of this affidavit.

John A. Sheehy, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 2ⁿᵈ day of June, 2015.

HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE